[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 02-14469

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 12, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 00-03542-CV-JLK

THOMAS JOHNSON,
DERRICK ANDRE THOMAS,
ERIC ROBINSON,
ADAM HERNANDEZ,
KATHRYN WILLIAMS-CARPENTER,
JAU'DOHN HICKS,
JOHN HANES,
in their own right and as
representatives of all ex-felon citizens
of Florida,

Plaintiffs-Appellants,

OMALI YESHITELA,

Plaintiff,

versus

GOVERNOR OF THE STATE OF FLORIDA,
Jeb Bush,
SECRETARY OF THE STATE OF FLORIDA,
Katherine Harris,
CHARLIE CRIST,
ROBERT MILLIGAN,

WILLIAM NELSON,
ROBERT CRAWFORD,
THOMAS GALLAGHER,
in their roles as members of the
Clemency Board of Florida,
BEVERLY HILL,
Alachua County Election Supervisor, et al.,

                                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

**(April 12, 2005)**

Before EDMONDSON, Chief Judge, and TJOFLAT, ANDERSON, BIRCH,
DUBINA, BLACK, CARNES, BARKETT, HULL, WILSON, PRYOR, and
KRAVITCH, Circuit Judges.[*]

KRAVITCH, Circuit Judge:

## I.  Introduction

This case involves a Fourteenth Amendment Equal Protection Clause

challenge and a Section 2 Voting Rights Act ("VRA") challenge to Florida's felon

disenfranchisement law which provides that "[n]o person convicted of a

felony...shall be qualified to vote or hold office until restoration of civil rights or

_____

[*] Circuit Judge Marcus recused and did not participate in this case.  Circuit Judge
Kravitch elected to participate in this decision, pursuant to 28 U.S.C. § 46(c).

2

removal of disability."[1] Fla. Const. art. VI, § 4 (1968). The plaintiffs filed this class action on behalf of all Florida citizens who have been convicted of a felony and have completed all terms of their incarceration, probation, and parole but who are barred from voting under the state's felon disenfranchisement law.[2] The defendants are members of Florida's Clemency Board.[3]

## II. Procedural History and Standard of Review

After cross motions for summary judgment, the district court granted summary judgment in favor of the defendants on all claims. A divided panel of

---

[1] The full text of the provision states:
No person convicted of a felony, or adjudicated in this or any other state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability.
Fla. Const. art. VI, § 4 (1968).

A felon who has completed his sentence may apply for clemency to have his civil rights restored. Fla. Stat. § 940 (2003). The plaintiffs also allege that Florida's voting rights restoration scheme violates constitutional and statutory prohibitions against poll taxes. Access to the franchise cannot be made to depend on an individual's financial resources. See Harper v. Va. State Bd. of Elections, 383 U.S. 663, 668 (1966). Under Florida's Rules of Executive Clemency, however, the right to vote can still be granted to felons who cannot afford to pay restitution. The requirement of a hearing is insufficient to support the plaintiffs' claim. Because Florida does not deny access to the restoration of the franchise based on ability to pay, we affirm the district court's grant of summary judgment in favor of the defendants on these claims. In doing so, we say nothing about whether conditioning an application for clemency on paying restitution would be an invalid poll tax.

[2] Approximately seventy percent of the plaintiffs class is white.

[3] The Clemency Board is made up of the Governor of Florida and members of the Cabinet. The Clemency Board has the power to restore the civil rights of convicted felons, including the right to vote. See Fla. R. Exec. Clemency. The suit also named Florida's county supervisors of elections. Their participation has been abated pending determination of liability.

this court reversed and remanded on both the Equal Protection and VRA claims. Johnson v. Governor of State of Florida, 353 F.3d 1287 (11th Cir. 2003), vacated 377 F.3d 1163. This court vacated the panel opinion and granted a rehearing en banc. Johnson, 377 F.3d at 1163-64. We now consider whether the district court erred in granting summary judgment in favor of the defendants on the plaintiffs' claims under the Equal Protection Clause of the Fourteenth Amendment and Section 2 of the Voting Rights Act.

We review a district court's grant of summary judgment de novo, "viewing the record and drawing all reasonable inferences in the light most favorable to the non-moving party." Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### III.  The Equal Protection Claim

The plaintiffs argue that Florida's felon disenfranchisement law violates the Equal Protection Clause, which prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The plaintiffs contend that racial animus motivated the adoption of Florida's criminal disenfranchisement provision in 1868 and this animus remains legally

4

operative today, notwithstanding the fact that Florida altered and reenacted the provision in 1968.

A state's decision to permanently disenfranchise convicted felons does not, in itself, constitute an Equal Protection violation. Richardson v. Ramirez, 418 U.S. 24, 53-55 (1974). The Supreme Court made this clear in Richardson, where it rejected a non-racial equal protection clause challenge to California's felon disenfranchisement law. 418 U.S. at 56. In doing so, the Court relied on Section 2 of the Fourteenth Amendment, holding that it expressly permits states to disenfranchise convicted felons.[4] The Court was persuaded that:

> [T]hose who framed and adopted the Fourteenth Amendment could not have intended to prohibit outright in § 1 of that Amendment that which was expressly exempted from the lesser sanction of reduced representation imposed by § 2 of the Amendment.

Id. at 43. Of course, the Equal Protection Clause prohibits a state from using a

---

[4] The full text of Section 2 states:
Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State. U.S. Const. amend. XIV, § 2.

facially neutral law to *intentionally* discriminate on the basis of race. <u>Washington v. Davis</u>, 426 U.S. 229, 239-40 (1976). This includes a criminal disenfranchisement law enacted with the intent to deprive one racial group of its right to participate in the political process. <u>Hunter v. Underwood</u>, 471 U.S. 222, 233 (1985). In light of this well-established precedent, the question here is whether the plaintiffs have alleged facts that, if true, would be sufficient to establish intentional discrimination in Florida's *current* disenfranchisement law.

1. Historical Background

Florida's policy of criminal disenfranchisement has a long history, tracing back well before the Civil War.[5] Florida's earliest Constitution, adopted in 1838, authorized the General Assembly to enact criminal disenfranchisement laws and in 1845, Florida's General Assembly enacted such a law.[6] Florida's 1861 and 1865

___

[5] Indeed, throughout history, criminal disenfranchisement provisions have existed as a punitive device. <u>See</u> Harvard Law Review Association, <u>One Person, No Vote: The Laws of Felon Disenfranchisement</u>, 115 Harv. L. Rev. 1939, 1939-42 (2002). When the Fourteenth Amendment was ratified, twenty-nine of thirty-six states had some form of criminal disenfranchisement law. <u>See</u> <u>Richardson</u>, 418 U.S. at 48. Today, forty-eight states have some form of criminal disenfranchisement provision. Although Florida's felon disenfranchisement law may be among the most restrictive, Florida hardly stands alone in its long-standing use of these laws.

[6] The 1838 Constitution provided that "[t]he general assembly shall have power to exclude from...the right of suffrage, all persons convicted of bribery, perjury, or other infamous crime." Fla. Const. art VI, § 4 (1838).

The 1845 provision stated:
*Be it further enacted*, That every person who shall become a candidate for any of the foregoing offices, shall possess the same qualification as that prescribed for a

Constitutions also contained criminal disenfranchisement provisions.

There is no doubt that Florida's decision to adopt a criminal disenfranchisement law in these early Constitutions was based on a non-racial rationale. At that time, the right to vote was not extended to African-Americans, and, therefore, they could not have been the targets of any disenfranchisement law. The plaintiffs, however, point to *1868* as the critical date on which they allege Florida's disenfranchisement law became motivated by racial discrimination.

Because the plaintiffs' Equal Protection claim hinges on the 1868 criminal disenfranchisement provision, we must examine the historical context in which that provision was adopted. After the Civil War, the Reconstruction Act required Florida to ratify the Fourteenth Amendment and change its Constitution as a condition for readmittance to the Union.[7] In accordance with a *federally mandated* plan, the South was divided into military districts with Florida under the command of General John Pope. Under his supervision, both African-Americans and white

---

voter, before he shall be eligible to that office. And no person who shall hereafter be convicted of bribery, perjury, or other infamous crime, shall be entitled to the right of suffrage.
1845 Fla. Laws. Ch. 38, art. 2 § 3.

[7] In Richardson, the Court briefly explained the process of how the southern states gained readmission to the Union following the Civil War. 418 U.S. at 48-52. The Court observed that many of the new *congressionally approved* state constitutions contained felon disenfranchisement provisions. Id.

7

delegates were elected to Florida's 1868 constitutional convention.

During the convention, a struggle for control erupted between the Radical Republicans and the Moderate Republicans. The Radical Republicans "wished to exclude native whites from state politics" and the Moderate Republicans were "opposed to the Radicals and willing to compromise with native whites." After a series of events unfolded, the Radical Republicans and Moderate Republicans each had drafted competing constitutions and both groups claimed to be the lawful convention. The Federal government supervised the process. Faced with a choice between the two constitutions, the United States Congress endorsed the Constitution drafted by the Moderate Republicans. It was subsequently ratified by the voters of Florida. Like Florida's earlier Constitutions, the 1868 Constitution contained a criminal disenfranchisement provision.[8] Thus, under federal supervision, a racially mixed delegation produced a constitution granting suffrage to men of all races.

We do not doubt that racial discrimination may have motivated certain other provisions in Florida's 1868 Constitution such as a legislative apportionment scheme that diminished representation from densely populated black counties. The existence of racial discrimination behind some provisions of Florida's 1868

---

[8] Notably, five African-American delegates at the convention explicitly voted for the 1868 criminal disenfranchisement provision.

8

Constitution does not, however, establish that racial animus motivated the criminal disenfranchisement provision, particularly given Florida's long-standing tradition of criminal disenfranchisement. Indeed, the plaintiffs' own historical expert conceded that prior to the instant case, no historian who had studied Florida's 1868 Constitution had ever contemplated that the 1868 criminal disenfranchisement provision was enacted with discriminatory intent.

The plaintiffs offer no contemporaneous evidence from the 1868 constitutional convention demonstrating that racial discrimination motivated the enactment of the 1868 disenfranchisement provision. To advance their theory, the plaintiffs rely almost exclusively[9] on a few isolated remarks[10] made *after* the 1868 Constitutional Convention. Although these comments reflect an unfortunate and indefensible racial animus in nineteenth-century Florida politics, there is no

---

[9] As further evidence of racial discrimination, the plaintiffs argue that the 1868 criminal disenfranchisement provision expanded the category of crimes by reaching all felonies. However, the plaintiffs conceded below that the term "infamous crimes" used in Florida's 1838 disenfranchisement provision was understood at common law to include all felonies. The use of the word "felony" in the 1868 Constitution merely reflected the language that was used in the Reconstruction Act which required the states to grant suffrage to all male citizens, twenty-one years and older "*except such as may be disenfranchised for participation in the rebellion or for felony at common law.*" Act of Mar. 2, 1867, ch. 163, 14 Stat. 428. § 5 (emphasis in original).

[10] For example, the plaintiffs cite to the fact that one of the Moderate Republican leaders stated in 1872 that he had kept Florida from becoming "niggerized." A review of the record suggests that this post-convention comment and others cited by the plaintiffs were likely made in reference to the legislative apportionment formula and a provision that circumvented local elections by requiring the governor to appoint county officials. The plaintiffs' own expert conceded that felon disenfranchisement was a relatively minor issue during the 1868 Convention.

9

evidence that these post-convention comments referenced the 1868 disenfranchisement provision. Indeed, the record strongly indicates that these comments referenced other provisions in the 1868 Constitution, such as the legislative apportionment system.[11] In addition, the plaintiffs point to the fact that Florida rejected the Radical Republican Constitution which did not contain a disenfranchisement provision in favor of the Moderate Republican Constitution which contained such a provision. Although this is true, it in no way establishes that racial discrimination motivated the disenfranchisement provision. There is no evidence to suggest that Florida's decision to adopt the Moderate Republican Constitution had anything to do with the disenfranchisement provision.[12] Furthermore, Florida did not act alone in choosing its Constitution--the United States Congress expressly approved Florida's 1868 Constitution in readmitting the state to the Union.

2. 1968 Constitutional Revision

One hundred years after the adoption of the 1868 Constitution, Florida comprehensively revised its Constitution. Once again, Florida chose to maintain a

---

[11] The only comment possibly referencing the felon disenfranchisement provision was made in 1881. But it is not clear whether this comment specifically referred to the adoption of the disenfranchisement provision in 1868. Moreover, we question the reliability of a single comment made *thirteen years* after the Convention.

[12] In fact, the record indicates that the reason the Moderate Republican Constitution was chosen was because it was signed by a clear majority of the delegates at the convention.

criminal disenfranchisement law, a decision explicitly left to its discretion by the text of the Fourteenth Amendment. The plaintiffs do not allege that racial discrimination motivated the adoption of Florida's 1968 felon disenfranchisement law.

The backdrop for the enactment of Florida's 1968 felon disenfranchisement provision is as follows. In 1965, the Florida Legislature appointed a thirty-seven member Constitutional Revision Commission ("CRC") to engage in "a careful study of the constitution...for the purpose of eliminating obsolete, conflicting and unnecessary provisions as well as for framing an orderly and properly arranged constitution, based upon economic and social changes." 1965 Fla. Laws, ch. 65-651. To engage in this process, the CRC delegated responsibilities to various committees. The Suffrage and Elections Committee was charged with, *inter alia*, examining Florida's felon disenfranchisement provision.

The plaintiffs contend that any revisions made in 1968 to Florida's felon disenfranchisement law were not substantive in nature.[13] We disagree. Florida's 1968 felon disenfranchisement provision is markedly different from

---

[13] To support this argument, the plaintiffs offer incomplete statements from a hodgepodge of legislative materials that were not before the district court at summary judgment. Even if we were to take judicial notice of all of these records, these materials would not help the plaintiffs. The plaintiffs also argue that the district court erred in excluding Richard Scher's expert report on the 1968 constitutional revision. We review evidentiary rulings for abuse of discretion, United States v. Smith, 231 F.3d 800, 807 (11th Cir. 2000), and conclude that the district court did not abuse its discretion. Even if admissible, Scher's report would not help the plaintiffs.

11

Florida's 1868 version. The 1868 Constitution (as amended in 1885) contained two provisions for criminal disenfranchisement.

Section 4 provided:

> No person under guardianship, *non compos mentis*, or insane, shall be qualified to vote at any election, nor shall any person convicted of felony by a court of record be qualified to vote at any election unless restored to civil rights.

Fla. Const. art. VI, § 4 (1885). Section 5 provided:

> The Legislature shall have the power to, and shall, enact the necessary laws to exclude...from the right of suffrage, all persons convicted of bribery, perjury, larceny, or other infamous crime...

Fla. Const. art. VI, § 5 (1885). After the 1968 revision, only one provision addressed felon disenfranchisement:

> No person convicted of a felony, or adjudicated in this or any state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability.

Fla. Const. art. VI, § 4 (1968).

Whereas the 1868 provisions disenfranchised persons convicted of certain misdemeanors such as petty larceny,[14] under the new 1968 provision, only those persons convicted of felonies could be disenfranchised. Therefore, the 1968

---

[14] According to the Florida Supreme Court, persons convicted of offenses enumerated in Section 5 of the 1868 disenfranchisement provision, including a misdemeanor such as "petty larceny" were disenfranchised. State ex. Rel. Jordan v. Buckman, 18 Fla. 267, 270 (1881).

provision narrowed the class of persons who could be disenfranchised and re-enfranchised some persons who previously were disenfranchised.[15]

Additionally, before submitting its proposal to the CRC, the Suffrage and Elections Committee considered several motions to alter the newly proposed felon disenfranchisement provision.[16] Notably, the committee considered but rejected an

---

[15] The plaintiffs focus on what they call the "automatic felony disenfranchisement provision" and assert that it remained unaffected by the 1968 revision. Presumably, the plaintiffs are referring to Section 4 of the 1868 provision. The plaintiffs' argument is misleading. Section 5 of the 1868 provision was also an "automatic disenfranchisement" provision because it *required* the legislature to enact disenfranchisement laws. In deleting Section 5 in 1968, the legislature did engage in a revision of what the plaintiffs call "automatic disenfranchisement." Therefore, the "automatic disenfranchisement provision" (which encompassed both sections 4 and 5 in the 1868 provision) was revised in 1968.

[16] The committee minutes state:
Mr. Earle moved that Article VI, Section 4 be adopted by the Committee on Suffrage and Elections. The motion was seconded. Mr. Pettigrew moved to amend Mr. Earle's motion by striking "judicially determined to be of unsound mind, or under judicial guardianship because of mental disability" and to substitute therefor "persons adjudicated mentally incompetent." This motion was seconded and passed. Mr. Pettigrew moved to further amend Section 4 by adding to his previous amendment: "in this or any other state and who have not had their competency judicially restored." This amendment was seconded and also passed. After considerable discussion, Mr. Pettigrew moved that Section 4 be deleted and the following inserted: "The Legislature may by law establish disqualifications for voting for mental incompetency or conviction of a felony." The motion was seconded. Mr. Goodrich offered the following substitute motion to Mr. Pettigrew's motion: Delete Section 4 and insert: 'The Legislature may by law exclude persons from voting because of mental incompetence or commitment to a jail or penal institution.' After discussion, Mr. Goodrich's motion failed for lack of a second. The vote was taken on Mr. Pettigrew's motion, but it failed of adoption. Mr. Goodrich moved that the word "felony" in line 2 of Section 4 be changed to "crime." The motion failed for lack of a second. The Committee adopted Section 4 of Article VI with no further amendments.
Minutes of the Suffrage and Elections Committee of the Florida Constitution Revision Commission, Feb. 2-3, 1966, at 6-7.

13

amendment which would have ended blanket disenfranchisement of felons and instead would have vested the legislature with the power to impose criminal disenfranchisement. The committee also considered and rejected an amendment to limit felon disenfranchisement to those still in prison. Had the committee only been engaged in stylistic revisions, as the plaintiffs urge was the case, it would not have considered or debated these alternatives.

The committee's final proposal then was sent to the CRC. The CRC met to review the changes to the Constitution and submitted a draft to the legislature. The legislature approved the proposed new Constitution containing the disenfranchisement provision; it then was affirmed by the voters of Florida. Thus, Florida's 1968 Constitution, including the felon disenfranchisement provision, was adopted after four stages of review.

3. Equal Protection Analysis

A facially-neutral law violates the Equal Protection Clause if adopted with the intent to discriminate against a racial group.[17] <u>Washington v. Davis</u>, 426 U.S.

---

[17] Proof of intentional discrimination is required under the Equal Protection Clause. One factor relevant to the intent inquiry is whether the law being challenged has an impact that bears more heavily on one race than another. See <u>Village of Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 266 (1977). Here, Florida's felon disenfranchisement provision did not create a significant disparate impact along racial lines in 1968. Accepting the plaintiffs' estimates for 1968 as true, the felon disenfranchisement denied voting rights to far more whites than African-Americans and decreased the percentage of African-American voters state-wide by less than one quarter of one percent. The plaintiffs' best estimates show that 44,562 white voters and 16,150 black voters were disenfranchised in 1968 due to a felony conviction. Although

at 239.  In <u>Hunter v. Underwood</u>, the Supreme Court examined head-on an equal

protection challenge to a criminal disenfranchisement provision.  471 U.S. at 223.

There, the Court determined that Alabama's criminal disenfranchisement provision

violated the Equal Protection Clause because it was adopted in 1901 to minimize

the political power of its African-American population.  <u>Id.</u> at 228-230.[18]  After the

1901 enactment, the Alabama legislature neither altered the provision nor

reenacted it in a political atmosphere free of racial bias.  Rather, all of the

amendments to the provision were the result of judicial action.  <u>Id.</u> at 233.

The <u>Hunter</u> Court articulated a two-step test to analyze whether a criminal

disenfranchisement provision violates the Equal Protection Clause.  <u>Id.</u> at 227-28.

The Court directed as follows:

> Presented with a neutral state law that produces disproportionate effects
> along racial lines, the Court of Appeals was correct in applying the
> approach of <u>Arlington Heights</u> to determine whether the law violates
> the Equal Protection Clause of the Fourteenth Amendment: "[O]fficial

proportionately more African-American voters were affected, the percentage of eligible African-American voters in the voting age public dropped only from 12.57% in 1967 to 12.32% in 1968. The plaintiffs focus on the *present* racially disparate impact of the felon disenfranchisement provision, but this amount of disparate impact was not present in 1968 when the provision was enacted.  Although disturbing, the *present* racially disparate impact of the felon disenfranchisement law does not guide our analysis.

[18] Unlike the case at bar, in <u>Hunter</u>, there was extensive evidence that racial animus motivated the 1901 disenfranchisement provision.  Alabama did not contest this fact.  Indeed, at oral argument Alabama's counsel conceded that "I would be very blind and naive [to] try to come up and stand before this Court and say that race was not a factor in the enactment of Section 182; that race did not play a part in the decisions of those people who were at the constitutional convention of 1901 and I won't do that."  <u>Id.</u> at 230.

15

action will not be held unconstitutional solely because it results in a racially disproportionate impact...Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Once racial discrimination is shown to have been a "substantial" or "motivating" factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor.

Id. (citation omitted).

Thus, under the Hunter analysis, we first examine whether racial discrimination was a substantial or motivating factor in the state's decision to deny the right to vote to felons. If there is evidence that racial discrimination was a motivating factor, we then ask whether the state can show that the provision would have been enacted in the absence of any racially discriminatory motive.

a. Applying Hunter v. Underwood

The essence of the plaintiffs' Equal Protection claim is that racial animus motivated the adoption of Florida's disenfranchisement law in 1868 and this animus remains legally operative today despite the re-enactment in 1968. As suggested earlier, we question whether the plaintiffs have adequately demonstrated that racial discrimination motivated the adoption of the 1868 provision. The plaintiffs introduced no contemporaneous evidence showing that racial discrimination motivated the adoption of the 1868 provision. Nevertheless, because of the procedural posture of this case, we are mindful of the need to view the evidence in the light most favorable to the plaintiffs. Thus, we will assume,

16

without deciding, that racial animus motivated the adoption of Florida's 1868 disenfranchisement law. That assumption does not, however, lead us to conclude that the plaintiffs satisfy the first step of Hunter. Importantly, we are concerned here with the validity of the *1968 provision*, not the 1868 provision and the plaintiffs concede that the 1968 provision was not enacted with discriminatory intent.[19]

In Hunter, the Supreme Court left open the precise question we confront here: whether a subsequent legislative re-enactment can eliminate the taint from a law that was originally enacted with discriminatory intent.[20] Hunter, 471 U.S. at 233. In Cotton v. Fordice, 157 F.3d 388 (5th Cir. 1988), the Fifth Circuit recognized that this issue was left open by Hunter and held that the facially neutral disenfranchisement provision in that case overcame its "odious origin" through legislative amendments. 157 F.3d at 391. The Fifth Circuit pointed out that the disenfranchisement provision at issue was originally enacted in 1890 with

_____

[19] There is no allegation in the plaintiffs' complaint that the 1968 provision was adopted with the intent to discriminate based on race. Indeed, the plaintiffs stipulated that there is no evidence that legislators in 1968 were concerned with or considered the consequences of the policy along racial lines.

[20] The Supreme Court concluded that revision to the provision by *state courts*, which severed "some of the more blatantly discriminatory" portions of the law, did not purge the provision of its *legislative* intent. Hunter, 471 U.S. at 232-33. The Supreme Court, however, did not hold that intervening *legislative* changes to the policy would have been legally insufficient to remove an earlier discriminatory intent.

17

discriminatory intent, but was amended by the legislature in 1950 to remove burglary as a disenfranchising crime, and was amended in 1968 to add murder and rape as disenfranchising crimes, two crimes which were historically excluded because they were not considered "black" crimes. Id. The court emphasized the deliberative process through which the provision had twice been amended: First, both houses of the legislature had to pass the amendment by a two-thirds vote; then the Mississippi Secretary of State had to publish the full text of the provision at least two weeks before the popular election; finally, a majority of the voters had to approve the full text of the provision. Id. Thus, the Fifth Circuit held that "[b]ecause Mississippi's procedure resulted both in 1950 and in 1968 in a re-enactment of [the provision], each amendment superseded the previous provision and removed the discriminatory taint associated with the original version." Id.

The situation here is similar to that in Cotton v. Fordice. Like Mississippi's provision, Florida's disenfranchisement provision was amended through a deliberative process in 1968. The 1968 provision narrowed the class of disenfranchised individuals to those convicted of felonies. Moreover, the provision first was considered by the Suffrage and Elections Committee. The Committee sent its final proposal to the CRC. The CRC reviewed the changes to the Constitution and sent a draft to the legislature, which approved the new

18

Constitution. Finally, the voters approved the new Constitution. Thus, as in

Cotton v. Fordice, Florida's 1968 re-enactment eliminated any taint from the

allegedly discriminatory 1868 provision, particularly in light of the passage of time

and the fact that, at the time of the 1968 enactment, no one had ever alleged that

the 1868 provision was motivated by racial animus.

Even if the plaintiffs were somehow able to satisfy the first step of Hunter,

their Equal Protection claim would still fail. Under the second step of Hunter, we

examine whether Florida would have chosen to disenfranchise felons in 1968 if

legislators did not have a discriminatory motive. In Hunter, this was a more

complicated analysis because it required a counter-factual scenario: given that

Alabama only legislatively addressed the disenfranchisement issue once, what

would legislators have done if they did not have a discriminatory motive? 471

U.S. at 228-29. Here, we have the luxury of not having to delve into a complex

counter-factual scenario because Florida simplified the analysis by returning to the

issue in 1968. Florida's 1968 Constitution permits us to determine whether the

state would have chosen to disenfranchise felons if the impermissible motive was

absent. The results are plain: there is no allegation of racial discrimination in 1968

and the legislators decided to include a felon disenfranchisement provision in the

revised constitution after consideration by both the CRC and the Suffrage and

19

Elections Committee. This decision was then affirmed by both houses of the legislature and by the voters of Florida.

Thus, Florida's felon disenfranchisement provision is not a violation of the Equal Protection Clause under the standard the Court adopted in Hunter. Florida's re-enactment of the felon disenfranchisement provision in the 1968 Constitution conclusively demonstrates that the state would enact this provision even without an impermissible motive and did enact the provision without an impermissible motive. The state has met its burden as a matter of law by substantively reenacting the law for race-neutral reasons.

The plaintiffs urge that the defendants should bear a greater burden. They contend that Florida must affirmatively prove that racial discrimination was not a substantial or motivating factor behind the disenfranchisement law in 1968. Specifically, the plaintiffs argue that Florida must demonstrate that it acknowledged that racial discrimination tainted the 1868 provision, and yet it knowingly reenacted the disenfranchisement provision for non-discriminatory reasons in 1968. We do not require this level of proof.[21] Florida's felon

---

[21] Prior to this case, no expert had ever suggested that the 1868 disenfranchisement provision was motivated by racial discrimination. The plaintiffs' standard establishes an insurmountable burden. As the defendants point out, if the court were to accept the plaintiffs' standard, then the more dubious an allegation of past discrimination in a predecessor provision, the more difficult it becomes for a state to extinguish it because it would be unlikely that the present day legislators would be aware of the past discrimination. The result would be to reverse the presumption that a State's laws are constitutional, and plunge federal courts into far-reaching

20

disenfranchisement provision is constitutional because it was substantively altered and reenacted in 1968 in the absence of any evidence of racial bias. Cotton v. Fordice, 157 F.3d 388 (5th Cir. 1998).

The plaintiffs rely extensively on United States v. Fordice, 505 U.S. 717 (1992) to support their argument. Fordice, however, dealt with a challenge to Mississippi's system of higher education and involved an extreme case of recent state discrimination. Mississippi had actively resisted removing the segregated system of education in the 1960s, failed to fund even limited educational reform in 1969, and was sued by the United States and private plaintiffs in 1975 for failing to comply with the Equal Protection Clause.[22] Id. at 722-25. The issue in Fordice was whether the state's facially-neutral education system, adopted only after the state was required to integrate its schools by court order, was valid under the Equal Protection Clause if the system maintained the racially disparate impact that *de jure* segregation had created. The Supreme Court found that Mississippi's actions were not consistent with the Equal Protection Clause because Mississippi made no effort to remove the discriminatory effects of *de jure* segregation.

The present case and Fordice are not analogous. First, Florida has a valid

expeditions regarding the sins of the past in order to question the laws of today.

[22] In Fordice, the question was one of what remedy the Constitution requires after a State has already been found liable for violating the Constitution via *de jure* segregation. By contrast, here the question is one of liability, not remedy.

public policy reason for disenfranchising felons, where Mississippi did not have a sound justification for its education policies. Justice Thomas, in his concurring opinion in Fordice, specifically stated that heightened review is only applicable when there is no sound public policy justification for the state law, stating: "A challenged policy does not survive under the standard we announce today if it began during the prior *de jure* era, produces adverse impacts, and persists without sound educational justification." Fordice, 505 U.S. at 746. Unlike Mississippi, which did not have a valid educational justification for maintaining segregated schools, Florida has a legitimate reason for denying the vote to felons. Several courts have recognized the propriety of excluding felons from the franchise. See Richardson, 418 U.S. at 54-55; Green v. Board of Elections, 380 F.2d 445, 450-52 (2d Cir. 1967); Beacham v. Braterman, 300 F. Supp. 182, 184 (S.D. Fla.), aff'd, 396 U.S. 12 (1969).

Second, the current Florida provision was passed one hundred years after the allegedly intentional discrimination occurred, whereas Misssssippi's provision was passed shortly after the end of *de jure* segregation in education. Needless to say, the Florida legislators who passed the 1868 Constitution and the 1968 Constitution were not the same people. In Fordice, however, the legislators who refused to desegregate the Mississippi schools without a court order in the 1960s,

22

most likely overlapped significantly with the legislators who passed the facially neutral education system in the 1970s. Given the proximity in time between Mississipi's intentional discrimination and the facially neutral provision in education, the Court had a healthy skepticism that the facially neutral provision was indeed neutral. Certainly, the Mississipi legislators who voted for the facially neutral provision understood the history of racial segregation in education and the likely effect of their new education system. But this skepticism does not apply here, because it is not reasonable to assign any impermissible motives held by the 1868 Florida legislators to the 1968 legislators who voted for the present felon disenfranchisement provision.

Third, Florida's 1968 felon disenfranchisement provision did not continue the adverse disparate impact of earlier *de jure* measures, which makes the present case entirely different than the situation in Fordice. At the time the Mississippi legislature adopted its education system, the system of higher education was almost completely racially segregated. 505 U.S. at 722-23. In Fordice, therefore, the Supreme Court was concerned that Mississippi was attempting to perpetuate its racially segregated education system, established in a time of *de jure* segregation, through a facially-neutral provision. Conversely, when Florida adopted its felon disenfranchisement provision in 1968, the racial effects of the provision were

23

minor.[23] In 1968, Florida legislators and voters were not attempting to extend the effects of *de jure* discrimination with a facially-neutral provision because there was little adverse impact to extend by passing the felon disenfranchisement provision.[24] Florida's provision simply did not maintain a pattern of discrimination the way Mississippi's provision did. Consequently, the heightened review in Fordice is not appropriate here.

Finally, we note that this circuit has been reluctant to extend the education line of cases to other areas. As this court stated in Burton v. City of Belle Glade, school desegregation jurisprudence is unique and difficult to apply in other contexts. 178 F.3d 1175, 1190 (11th Cir. 1999); see also Johnson v. DeSoto County Bd. Of Comm'rs, 204 F.3d 1335, 1344 n.18 (11th Cir. 2000). Moreover, as discussed earlier, there is specific precedent from this court and the Supreme Court dealing with criminal disenfranchisement. See Hunter v. Underwood, 471 U.S. 222 (1985); Richardson v. Ramirez, 418 U.S. 24 (1974); Beacham v. Braterman, 300 F.Supp. 182, 183 (1969), aff'd 396 U.S. 12 (1969) (finding by a three judge panel that Florida's decision to disenfranchise felons was not a

---

[23] According to the plaintiffs' estimates, in 1968, 3.13% of voting age African-Americans were disenfranchised due to a felony conviction as compared to 1.24% of non African-Americans.

[24] In contrast to school desegregation where the racially disparate impact was at its height in the 1950s and 1960s and has decreased since, the felon disenfranchisement rule had very little racially disparate impact in the 1960s and only developed such an effect many years later.

violation of the plaintiff's equal protection or due process rights). Because these cases establish clear standards by which to judge state action, we are bound by precedent and need not go into other areas of possibly analogous law.

For the above reasons, we affirm the district court's grant of summary judgment on this claim.

## IV. The Voting Rights Act Claim

The plaintiffs also argue that Florida's felon disenfranchisement law violates Section 2 of the Voting Rights Act. As a threshold matter, this claim raises an important question of statutory interpretation, namely, whether Section 2 of the Voting Rights Act applies to Florida's felon disenfranchisement provision. The Circuits are split on this issue. Compare Muntaqim v. Coombe, 366 F.3d 102, 124 (2d Cir. 2004) (holding that Section 2 did not reach New York's felon disenfranchisement statute), cert. denied, 125 S.Ct. 480 (2004), and reh'g en banc granted, 2004 WL 2998551 (2004) with Farrakhan v. Washington, 338 F.3d 1009, 1014-15 (9th Cir. 2003) (holding that Section 2 applied to Washington's felon disenfranchisement law), cert. denied, 125 S.Ct. 477 (2004); Wesley v. Collins, 791 F.2d 1255, 1259-61 (6th Cir. 1986) (assuming that Section 2 of the VRA applies to felon disenfranchisement laws but holding that there was no violation); see also Farrakhan v. Washington, 359 F.3d 1116 (9th Cir. 2004) (Kozinski, J., dissenting from denial of rehearing en banc) (arguing that Section 2 of the VRA

25

does not apply to felon disenfranchisement laws).

1.  The Scope of the Voting Rights Act

Congress enacted the Voting Rights Act pursuant to its enforcement powers under the Fourteenth and Fifteenth Amendments for the remedial purpose of eliminating racially discriminatory voting practices. South Carolina v. Katzenbach, 383 U.S. 301, 308 (1966); United States v. Marengo County Commission, 731 F.2d 1546, 1555 (11th Cir. 1984). Recognizing the subtle ways that states often denied racial minorities the right to vote, in 1982, Congress amended Section 2 of the Voting Rights Act so that a plaintiff could establish a violation without proving discriminatory intent.[25] See Chisom v. Roemer, 501 U.S. 380, 383-84 (1991). Thus, it is well-settled that a plaintiff can challenge voting qualifications under a "results" test.[26] Id. Section 2 of the Voting Rights Act of

---

[25] Specifically, Congress amended the Voting Rights Act in 1982 in response to the Supreme Court's holding in City of Mobile v. Bolden, 446 U.S. 55 (1980), which required proof of intentional discrimination to establish a violation under Section 2.

[26] Two types of discriminatory practices and procedures are covered by section 2: those that result in "vote denial" and those that result in "vote dilution." The plaintiffs'claim here is one of vote denial. Vote denial occurs when a state employs a "standard, practice, or procedure" that results in the denial of the right to vote on account of race. 42 U.S.C. § 1973(a); Burton v. City of Belle Glade, 178 F.3d 1175, 1197-98 (11th Cir. 1999). To prevail, a plaintiff must prove that "under the totality of the circumstances,...the political processes..are not equally open to participation by [members of a protected class]...in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). In making this inquiry, courts consider a non-exclusive list of objective factors (the "Senate factors") detailed in a Senate Report accompanying the 1982 amendments. See S. Rep. No. 97-417, at 28-29, 1998 U.S.C.C.A.N. at 206; Thornburg v. Gingles, 478 U.S. 30, 36 (1986). Because we conclude that Section 2 of the Voting Rights Act does not reach Florida's felon disenfranchisement provision, there is no need to consider the

26

1965, 42 U.S.C. § 1973, as amended, provides in relevant part[27]:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color...

> (b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that...members [of protected racial minorities] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973. Despite its broad language, Section 2 does not prohibit all

voting restrictions that may have a racially disproportionate effect. See Chisom,

501 U.S. at 383 ("Congress amended § 2 of the Voting Rights Act to make clear

---

plaintiffs' evidence of alleged discrimination in Florida's criminal justice system which might be relevant under the totality of the circumstances inquiry.

[27] The full text, as amended in 1982, states:
(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered. *Provided*, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their participation in the population.

42 U.S.C. § 1973.

27

that *certain* practices and procedures that result in the denial or abridgement of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge.") (emphasis added); Muntaqim, 366 F.3d at 116. Felon disenfranchisement laws are unlike other voting qualifications. These laws are deeply rooted in this Nation's history[28] and are a punitive device stemming from criminal law. See Richardson, 418 U.S. at 48-52. Today, all states except two have some form of criminal disenfranchisement provision.

Most important, Florida's discretion to deny the vote to convicted felons is fixed by the text of § 2 of the Fourteenth Amendment, which states:

> [W]hen the right to vote...is denied to any of the male inhabitants...or in any way abridged, *except for participation in rebellion, or other crime*, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

U.S. Const. amend. XIV, § 2 (emphasis added).[29] As the Court explained in

---

[28] When the Fourteenth Amendment was ratified, twenty-nine out of thirty-six states had some form of criminal disenfranchisement provision. Richardson, 418 U.S. at 48. The prevalence of these laws before African-Americans were granted the right to vote indicates that states have historically maintained these laws for race-neutral reasons.

[29] The plaintiffs argue that the Fourteenth Amendment's endorsement of felon disenfranchisement laws should not control our analysis because the Fifteenth Amendment does not contain similar language and, in their view, the Fifteenth Amendment repealed § 2 of the Fourteenth Amendment. The plaintiffs cite to no case law to support this bold assertion and we find no merit in this argument. The plain text of the Constitution is clear and we must follow it.

Richardson, "the exclusion of felons from the vote has an affirmative sanction in section 2 of the Fourteenth Amendment, a sanction which was not present in the case of the other restrictions on the franchise which were invalidated [in other cases]." 418 U.S. at 54. Thus, interpreting Section 2 of the Voting Rights Act to deny Florida the discretion to disenfranchise felons raises serious constitutional problems because such an interpretation allows a congressional statute to override the text of the Constitution.

It is a long-standing rule of statutory interpretation that federal courts should not construe a statute to create a constitutional question unless there is a clear statement from Congress endorsing this understanding.[30] As the Supreme Court stated in DeBartolo Corp. v. Florida Gulf Coast Trades Council:

---

[30] Before turning to a canon of statutory interpretation, we must find some level of ambiguity in the words of the statute. Dep't of HUD v. Rucker, 535 U.S. 125, 134 (2002); Harry v. Marchant, 291 F.3d 767, 770 (11th Cir. 2002) (en banc). Although Section 2 of the VRA does not require proof of intentional discrimination behind the enactment of the challenged voting qualification, Congress's decision to retain the phrase "on account of race or color" makes it unclear as to whether Section 2 would apply to Florida's felon disenfranchisement provision, which is endorsed by the Fourteenth Amendment, applies to felons without regard to race or color (it is particularly telling that over seventy percent of the plaintiffs' class is white), and is administered as one component of a felon's criminal sentence. See Muntaqim, 366 F.3d at 116; Nipper v. Smith, 39 F.3d 1494, 1515 (11th Cir. 1994) ("to be actionable, a deprivation of a minority group's right to equal participation in the political process must be on account of a classification, decision, or practice that depends on race or color, *not on account of some other racially neutral cause*.") (emphasis added). Moreover, the deep division among eminent judicial minds on this issue demonstrates that the text of Section 2 is unclear. See Muntaqim, 366 F.3d at 116-118 ("Unfortunately, it 'is exceedingly difficult to discern what [Section 2] means.'"). Finally, the interpretation of the statute advanced by the dissenters would suggest that currently incarcerated felons may also fall within the scope of the statute. Unless one concedes that Section 2 of the VRA reaches currently incarcerated felons, the interpretation advanced by the dissenters provides an additional reason why the statute is unclear.

29

> [W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress. This cardinal principle has its roots in Chief Justice Marshall's opinion for the Court in <u>Murray v. The Charming Betsy</u>, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804), and has for so long been applied by this Court that it is beyond debate...This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution. The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it.

485 U.S. 568, 575 (1988). Thus, when we analyze the scope of the Voting Rights Act, we should first address whether one interpretation presents grave constitutional questions whereas another interpretation would not, and then examine whether the latter interpretation is clearly contrary to Congressional intent. <u>Id.</u>

Here, the plaintiffs' interpretation creates a serious constitutional question by interpreting the Voting Rights Act to conflict with the text of the Fourteenth Amendment.[31] The Fourteenth and Fifteenth Amendments to the United States

---

[31] In saying this, we in no way doubt Congress's authority to enact the VRA nor do we question that, as a general rule, the results test of Section 2 is constitutionally sound. <u>See</u> <u>United States v. Marengo County Comm'n</u>, 731 F.2d 1546, 1556-63 (11th Cir. 1984) (holding that Section 2's results test is constitutional on its face). The only issue here is our *concern* over whether Congress would exceed its authority if we were to apply Section 2 to Florida's felon disenfranchisement law. Even assuming *arguendo* that Section 2 of the VRA applies to Florida's provision, a review of the record strongly suggests that the plaintiffs' Section 2 claim would still fail. The plaintiffs would have to demonstrate that specific and relevant racial biases

Constitution grant Congress the power to enforce those amendments' substantive provisions "by appropriate legislation." U.S. Const. amend. XIV, § 5; XV, § 2. Congress may enforce the substantive provisions of these Amendments by regulating conduct that does not directly violate those Amendments. See South Carolina v. Katzenbach, 383 U.S. 301 (1966). As the Court has explained, "Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." Nevada Dep't of Human Resources v. Hibbs, 538 U.S. 721, 727-28 (2003).

Nonetheless, Congress's power in this regard is not absolute. To be a valid exercise of Congress's enforcement power, "there must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." City of Boerne v. Flores, 521 U.S. 507, 520 (1997).

---

in society interact with the felon disenfranchisement rule, resulting in a denial of the franchise "*on account of race or color*." Cf. Thornburg v. Gingles, 478 U.S. 30, 47 (1987) (stating that the Voting Rights Act requires that electoral practices interact with social or historical conditions to *cause* a racial inequality in the political process); Nipper v. Smith, 39 F.3d 1494, 1515 (11th Cir. 1994) ("The existence of some form of racial discrimination remains the cornerstone of Section 2 claims..."). We are concerned only with how the state allegedly discriminates against similarly situated persons who have committed felonies. Although the record includes some evidence of a statistical difference in the rate of felony convictions along racial lines, these disparities do not demonstrate racial bias. There are a myriad of factors other than race that may explain the disparity. For example, an individual's socioeconomic status, prior criminal record, gravity of offense, strength of evidence, nature of legal representation, and age of offender might explain the disparity. Moreover, the plaintiffs' own expert found that *whites* have disproportionately high conviction rates for four of the nine categories of crimes he analyzed. Furthermore, there is no significant racial disparity in the sentences received by convicts with similar guideline scores.

Congress undoubtedly has the constitutional authority to prohibit many measures that are not explicitly prohibited by the Fourteenth Amendment, but this enforcement power arguably does not extend to prohibiting constitutionally protected practices. This is not to say that a state's felon disenfranchisement provision can never be challenged. As the Court's decision in Hunter made clear, states cannot use disenfranchisement provisions to discriminate intentionally on the basis of race. 471 U.S. at 233. Thus, the plaintiffs have a remedy if the state's provision violates the Equal Protection Clause. Id. It is a different matter, however, when a federal statute is read to limit a state's delegated power.

Moreover, as the Second Circuit detailed in Muntaqim, there are additional reasons why the plaintiffs' interpretation of the Voting Rights Act calls into question Congress's enforcement power. 366 F.3d at 118-126. For Congress to enact proper enforcement legislation, there must be a record of constitutional violations.[32] See Board of Trustees of University of Alabama v. Garrett, 531 U.S.

---

[32] As the Court has explained, Congress must (1) "identify conduct transgressing...the substantive provisions" of the amendments and (2) "tailor its legislative scheme to remedying or preventing such conduct." Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savs. Bank, 527 U.S. 627, 639 (1999). In addition to the absence of findings showing that felon disenfranchisement laws are used to discriminate, it is also questionable whether applying Section 2 to reach all felon disenfranchisement laws would be a congruent and proportionate response to the purported problem with these laws. Section 2 applies nationwide to all states and there is no termination date. Given that racial minorities are overrepresented in the felon population, the plaintiffs' theory would cast into doubt most felon disenfranchisement laws in this country. See Boerne, 521 U.S. at 533 (noting that although enforcement legislation need not have "termination dates, geographic restrictions, or egregious predicates...limitations of this kind tend to ensure Congress' means are proportionate to ends legitimate under" the Enforcement

356, 368 (2001); <u>Kimel v. Florida Bd. of Regents</u>, 528 U.S. 62, 89 (2000). In

<u>Oregon v. Mitchell</u>, 400 U.S. 112, 118 (1970), <u>superseded by</u> U.S. Const. amend.

XXVI, the Court reviewed the 1970 amendments to the Voting Rights Act, which

imposed a temporary ban on literacy tests and lowered from 21 to 18 the minimum

voting age. There, the Court affirmed the literacy test ban but held that Congress

exceeded its authority in lowering the voting age from 21 to 18 in state elections.

The Court concluded that "Congress had before it a long history of discriminatory

use of literacy tests to disenfranchise voters on account of their race" but

"Congress made no legislative findings that the 21 year old requirement was used

by the States to disenfranchise voters on account of race." <u>Mitchell</u>, 400 U.S. at

130, 132.

As was the case in <u>Mitchell</u>, when Congress enacted the VRA and its

subsequent amendments, there was a complete absence of congressional findings

that felon disenfranchisement laws were used to discriminate against minority

voters.[33] Without a record of constitutional violations, applying Section 2 of the

Voting Rights Act to Florida's felon disenfranchisement law would force us to

Clause).

[33] The plaintiffs suggest that it is unreasonable to require a specific record of violations because Congress could not identify every form of voting discrimination when it enacted the Voting Rights Act. Given the widespread existence of felon disenfranchisement laws throughout this Nation's history and the fact that many States had such laws on their books when the VRA was enacted, we find no merit in this argument.

33

address whether Congress exceeded its enforcement powers under the Fourteenth and Fifteenth Amendments.[34]

For these reasons, we believe that the plaintiffs' interpretation of the VRA raises grave constitutional concerns.[35] For the plaintiffs' interpretation to be

---

[34] The plaintiffs concede that Congress compiled no record of constitutional violations with respect to felon disenfranchisement provisions. They contend, however, that Congress's enforcement power is broader when it acts to prohibit discrimination against a suspect class or to protect a fundamental right such as voting. See Tennessee v. Lane, 124 S.Ct. 1978, 1991-92 (2004) (court access); Hibbs, 538 U.S. at 735-36 (sex). Although this is true, the Supreme Court still requires *some* record of constitutional violations to ensure that Congress had an adequate constitutional basis for prophylactic legislation. Hibbs, 538 U.S. at 735; Lane, 124 S.Ct. at 1992. The plaintiffs also cite to the Court's decision in Hunter v. Underwood as evidence of a record of constitutional violations with regard to felon disenfranchisement provisions. A key problem with this argument is that the Court did not decide Hunter until 1985, three years after the 1982 amendments to the Voting Rights Act. Thus, Congress could not have relied on Hunter when it enacted the amended Section 2 of the Voting Rights Act. Moreover, evidence of a purposefully discriminatory criminal disenfranchisement law in Alabama could not justify congressional regulation of Florida's law, which was enacted for race-neutral reasons.

[35] We also note that application of the VRA to Florida's felon disenfranchisement provision could raise federalism concerns in that it significantly alters the constitutionally mandated balance of power between the States and the Federal Government. See Gregory v. Ashcroft, 501 U.S. 452, 457-61 (1991). Whenever Congress intrudes upon "a decision of the most fundamental sort for a [State],...'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' this balance. Gregory v. Ashcroft, 501 U.S. at 461 (quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 243 (1985)). Congress' intent must be "unmistakably clear in the language of the statute." Id. at 460-61. In Gregory, Missouri state court judges challenged a provision of the Missouri Constitution that required certain judges to retire at the age of seventy as being in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621-634 (ADEA). After concluding that "the authority of the people of the States to determine the qualifications of their most important government officials...lies at the heart of representative government," the Court found that state judges were not covered by the ADEA because Congress did not make their inclusion unmistakably clear. Id. at 467. As in Gregory, the balance of power between the States and the Federal Government is at issue in this case. If defining the qualifications of important government officials lies at the heart of representative government, then surely defining who decides what those qualifications will be is equally important. Although the States' power in this regard must be exercised in accordance with the Fourteenth and Fifteenth Amendments, § 2 of the Fourteenth amendment establishes an explicit constitutional balance

34

correct, we must look for a clear statement from Congress that it intended such a constitutionally-questionable result. DeBartolo, 485 U.S. at 575. Instead of a clear statement from Congress indicating that the plaintiffs' interpretation is correct, the legislative history indicates just the opposite–that Congress never intended the Voting Rights Act to reach felon disenfranchisement provisions.[36]

## 2. Congressional Statements in 1965

Congress first passed the Act in 1965 to prevent states from discriminating against minorities in voting. The act was intended to reach voting tests and other practices, such as districts designed by states to minimize minority voting. See Burton v. City of Belle Glade, 178 F.3d 1175, 1196 (11th Cir. 1999). The Senate and House reports strongly suggest, however, that Congress did not intend Section

---

between the States and the Federal Government by giving the States authority to continue the prevalent practice of disenfranchising felons. If Congress wishes to alter the balance of power in this area, its intention must be unmistakably clear.

[36] Only the Ninth Circuit has found a felon disenfranchisement provision to be a statutory violation. Farakhan v. Washington, 338 F.3d 1009 (9th Cir. 2003). There, the plaintiffs brought a Voting Rights Act challenge to the State of Washington's felon disenfranchisement provision, claiming that racism in the criminal justice system interacted with the state's suffrage laws to deny equal voting opportunities to minorities. Id. at 1020. The Ninth Circuit reversed the grant of summary judgment, but did not specifically address the constitutionality of its interpretation. Logically, that court must have found that the statute covered the challenged provision and that Congress had the constitutional authority to regulate felon disenfranchisement provisions to reach its holding. Nevertheless, the Ninth Circuit did not provide any reasoning for its finding, and thus that court's decision, which is only persuasive authority in our circuit, should not compel our analysis.

35

2 of the Voting Rights Act to cover felon disenfranchisement provisions.[37]  These

reports indicate that tests for literacy or good moral character should be

scrutinized, but felon disenfranchisement provisions should not.  S. Rep. 89-162,

1965 U.S.C.C.A.N. 2508, 2562.  The only place where legislators addressed felon

disenfranchisement was with regard to Section 4 of the VRA, where the Senate

Report reflects that legislators intended to *exempt* the voting restrictions on felons

from the statute's coverage, stating:

> The third type of test or device covered is any requirement of good
> moral character.  This definition would not result in the proscription
> of the frequent requirement of States and political subdivisions that an
> applicant for voting or registration for voting be free of conviction of
> a felony or mental disability.

Id.  Likewise, the House Report also states that the Voting Rights Act was not

designed to reach felon disenfranchisement provisions:

> This subsection does not proscribe a requirement of a State or any
> political subdivision of a State that an applicant for voting or
> registration for voting be free of conviction of a felony or mental
> disability.

H.R. Rep. No. 89-439, 1965 U.S.C.C.A.N. 2437, 2457.  These reports indicate that

neither house of Congress intended to include felon disenfranchisement within the

---

[37] We recognize that there is no legislative history directly referencing Section 2 of the
VRA that mentions felon disenfranchisement provisions.  Nonetheless, we find Congress's
treatment of these provisions in reference to other sections of the VRA to be persuasive on this
matter.

statute's scope. These are the only references to felon disenfranchisement made in reports to the 1965 act.

Furthermore, this court's predecessor decided that the 1965 Act did not cover a state's decision to exclude felons from voting. In United States v. Ward, the former Fifth Circuit held that the Voting Rights Act prohibited Louisiana from imposing any literacy test or other qualification on voter registration, but found that the act did not extend to felon disenfranchisement rules. 352 F.2d 329, 332 (5th Cir. 1965).[38] There, the court issued an order enjoining the state from applying the voting tests, but explicitly exempted felony convictions from the order. The court ordered that the state cease

> ...requiring any applicant for voter registration in Madison Parish, as a precondition to such registration, to take or pass any test of literacy, knowledge, or understanding or to comply with any other test or device as defined in Section 4(c) of the Voting Rights Act of 1965, Public Law 89-110, 79 Stat. 438-439, i.e., any requirement (including the "good character" requirement specified in Article VIII, Section 1(c) of the Louisiana Constitution and Title 18, Section 32, of the Louisiana Code, *except to the extent that these provisions permit disqualification for conviction of a felony).*

Id. at 332 (emphasis added).

3. Congressional Statements in 1982

---

[38] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Congress most recently amended the Voting Rights Act in 1982 in response to the Supreme Court's decision in <u>City of Mobile v. Bolden</u>, 446 U.S. 55 (1980), in an attempt to clarify the standard for finding Section 2 violations. In revising the statute, Congress intended to depart from the intent-based standard of the Supreme Court's Equal Protection jurisprudence and establish an effects-based standard. S. Rep. 97-417, 15-17, 1982 U.S.C.C.A.N. 177, 192-94 (1982). After the 1982 amendment, a state practice could survive Equal Protection Clause scrutiny but fail Section 2 Voting Rights Act scrutiny.

Neither the plain text nor the legislative history of the 1982 amendment declares Congress's intent to extend the Voting Rights Act to felon disenfranchisement provisions. The Senate Report, which details many discriminatory techniques used by certain jurisdictions, made no mention of felon disenfranchisement provisions.[39] Although it is conceivable that certain legislators may have wanted the Voting Rights Act to encompass felon disenfranchisement provisions, we should not assume that Congress intended to produce a statute

---

[39] The one-sided legislative history is buttressed by subsequent Congressional acts. Since 1982, Congress has enacted laws making it *easier* for states to disenfranchise felons. For instance, in 1993, Congress enacted the National Voter Registration Act (NVRA), Pub. L. No. 103-31, 107 Stat. 77 (1993), which authorizes states to purge felons from voter rolls. 42 U.S.C. § 1973gg-6(a)(3)(B). The Act also instructs federal prosecutors to give written notice to state election officials of persons convicted of felonies. 42 U.S.C. § 1973gg-6(g)(3). In this same Act, Congress sought to eliminate certain practices that dampen minority participation in the electoral process. Although not dispositive, this suggests that Congress did not intend to sweep felon disenfranchisement laws within the scope of the VRA.

contrary to the plain text of the Fourteenth Amendment without a clear statement. As the Second Circuit noted in Muntaqim, "considering the prevalence of felon disenfranchisement [provisions] in every region of the country since the Founding, it seems unfathomable that Congress would silently amend the Voting Rights Act in a way that would affect them." 366 F.3d at 123-24. There is simply no discussion of felon disenfranchisement in the legislative history surrounding the 1982 amendments.

Thus, we believe that applying Section 2 of the Voting Rights Act to felon disenfranchisement provisions raises grave constitutional concerns.[40] Chiefly, the plaintiffs' interpretation calls for a reading of the statute which would prohibit a practice that the Fourteenth Amendment permits Florida to maintain. As a matter of statutory construction, we should avoid such an interpretation. The case for rejecting the plaintiffs' reading of the statute is particularly strong here, where Congress has expressed its intent to *exclude* felon disenfranchisement provisions from Voting Rights Act scrutiny. Accordingly, we affirm the district court's grant of summary judgment to the defendants on the Voting Rights Act claim.

---

[40] In addition to the constitutional concerns, there are prudential concerns as well. If we were to accept the plaintiffs' interpretation of the statute, states might lose their ability to exclude felons currently in prison from the franchise. See Farrakhan, 359 F.3d at 1125-1127 (Kozinski, J., dissent from denial of rehearing en banc) (discussing the slippery slope problems of applying the Voting Rights Act to felon disenfranchisement provisions including implications for voter lists, Internet voting, and weekday elections).

## V. Wisdom of the Policy

Several amici curiae argue that, as a policy matter, felons should be enfranchised, particularly those who have served their sentences and presumably paid their debt to society. Even if we were to agree with the amici, this is a policy decision that the United States Constitution expressly gives to the state governments, not the federal courts. U.S. Const. Amend. XIV, § 2. Florida has legislatively reexamined this provision since 1868 and affirmed its decision to deny felons the right to vote. Federal courts cannot question the wisdom of this policy choice.

## VI. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of the defendants.

AFFIRMED.

TJOFLAT, Circuit Judge, specially concurring, in which, PRYOR, Circuit Judge, joins:

Section 2 of the Voting Rights Act (VRA) "outlaws election practices that result in racial discrimination." Nipper v. Smith, 39 F.3d 1494, 1509-10 (11th Cir. 1994) (en banc) (opinion of Tjoflat, C.J., joined by Anderson, J.). Specifically, it bars any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). Focusing only on the "which results in" language, both dissenters argue that we should remand this case to the district court for a trial to determine whether Florida's felon-disenfranchisement provision[1] produces a racially disparate impact. The majority argues that remand is inappropriate because the dissenters' theory creates a constitutional question that can be avoided by construing the statute not to cover felon-disenfranchisement provisions.[2] I write separately to demonstrate that, even if the dissenters are correct that the language of section 2 of the VRA unambiguously covers felon disenfranchisement provisions, summary judgment was appropriate in this case because the plaintiffs have not been able to show that

[1] The Florida constitution provides that "[n]o person convicted of a felony . . . shall be qualified to vote or hold office until restoration of civil rights." Fla. Const. art. VI, § 4 (1968).

[2] The constitutional question is created by the Fourteenth Amendment's savings clause regarding such provisions. See U.S. Const. amend. XIV, § 2.

whatever denial or abridgement of voting rights resulted from Florida's felon disenfranchisement provision occurred "on account of race or color." Remand is therefore not required.

It is true that section 2 of the VRA now requires something less than a showing of actual intent to discriminate by a State or political subdivision. I do not believe, however, that it requires only, as both dissenters imply, a showing of racially disparate effects. A brief discussion of section 2's history demonstrates this point. In 1980, the Supreme Court decided City of Mobile v. Bolden, 446 U.S. 55, 100 S. Ct. 1490, 64 L. Ed. 2d 47 (1980). Prior to its holding in that case, a number of circuits had applied a "totality of the circumstances" analysis in vote-dilution cases brought under the Equal Protection Clause of the Fourteenth Amendment. The old Fifth Circuit, our predecessor court, established the framework for this kind of analysis in Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir. 1973). That framework required courts to judge vote-dilution cases by measuring the relevant facts according to a number of factors, now commonly referred to as Zimmer factors.[3] Importantly for purposes of this discussion, those

_____

[3] Those factors are canvassed in the original opinion:

It is axiomatic that at-large and multi-member districting schemes are not per se unconstitutional. Nevertheless, where the petitioner can demonstrate that "its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice," White v. Regester, 412 U.S. [755,] 766, 93 S.Ct. [2332,] 2339, 37 L.Ed.2d [314 (1973)], Whitcomb v. Chavis, 403 U.S. [124,]

42

factors required a showing of something less than intent by a State actor to discriminate, but something more than a mere disparate impact to make out a claim of vote dilution.

Bolden involved a challenge to an at-large election arrangement in a multimember district in Mobile, Alabama. In that case, the Supreme Court held that Zimmer, "coming before Washington v. Davis, 426 U.S. 229 . . . , was quite evidently decided upon the misunderstanding that it is not necessary to show a discriminatory purpose in order to prove a violation of the Equal Protection Clause—that proof of a discriminatory effect is sufficient." Bolden, 446 U.S. at

---

149-150, 91 S.Ct. 1858[, 1872, 29 L. Ed. 2d 363 (1971)], such districting schemes are constitutionally infirm.

The Supreme Court has identified a panoply of factors, any number of which may contribute to the existence of dilution. Clearly, it is not enough to prove a mere disparity between the number of minority residents and the number of minority representatives. . . . [W]here a minority can demonstrate a lack of access to the process of slating candidates, the unresponsiveness of legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case is made. Such proof is enhanced by a showing of the existence of large districts, majority vote requirements, antisingle shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts. The fact of dilution is established upon proof of the existence of an aggregate of these factors. The Supreme Court's recent pronouncement in White v. Regester demonstrates, however, that all these factors need not be proved in order to obtain relief.

Zimmer, 485 F.2d at 1304-05 (footnotes and internal crossreferences omitted).

43

71, 100 S. Ct. at 1501-02.[4]  The Court viewed this conclusion as inescapable in light of Davis, and it concluded that to make out a vote-dilution claim a "plaintiff must prove that the disputed plan was 'conceived or operated as [a] purposeful devic[e] to further . . . discrimination.'"  Id. at 66, 100 S. Ct. at 1499 (quoting Whitcomb v. Chavis, 403 U.S. 124, 149, 91 S. Ct. 1858, 1872, 29 L. Ed. 2d 363 (1971)) (alterations and omission original).

In addition to seeking relief under a vote-dilution theory under the Equal Protection Clause, the plaintiffs had also sought relief under the VRA.  Bolden rejected this approach, too, holding that "it is apparent that the language of § 2 [of the VRA] no more than elaborates upon that of the Fifteenth Amendment, and the sparse legislative history of § 2 makes clear that it was intended to have an effect no different from that of the Fifteenth Amendment itself."  Id. at 60-61, 100 S. Ct. at 1496 (footnote omitted).  The Court noted explicitly that this meant by extension that section 2 as then written did not cover disparate-impact cases: "Our decisions . . . have made clear that action by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose."  Id. at 62, 100 S. Ct. at 1497.

---

[4] No one spoke for the Court in Bolden.  Although six Justices concurred in the Court's judgment, Justice Stewart wrote only for himself, Chief Justice Burger, and Justices Powell and Rehnquist.  For purposes of brevity, I do not pause to make this observation at every reference I make to Justice Stewart's opinion.

Apparently alarmed by these holdings, Congress set out to amend the VRA, ultimately doing so in 1982. See generally S. Rep. No. 97-417 (1982), reprinted in 1982 U.S.C.C.A.N. 177; see also Voting Rights Act Amendments, Pub. L. No. 97-205, 96 Stat. 131 (1982). The effect of this amendment was to recast the then-existing verison of section 2 as section 2(a) of the VRA and to add a new subsection, subsection (b).

The wording of the new section 2(a) is not identical to the old section 2. The new section 2(a) made two modifications: first, it made one change in phrasing. Compare 42 U.S.C. § 1973 (preamendment) ("No voting qualification . . . shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color." (emphasis added)), with 42 U.S.C. § 1973(a) (postamendment) ("No voting qualification . . . shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." (emphasis added)). Second, 2(a) added a phrase to make clear that abridgement or denial could be recognized "as provided in subsection (b)." 42 U.S.C. § 1973(a). The intended effect of the second modification is obvious; that of the first less so. As I explain, the first modification reflects Congress's desire to remove an intent requirement, but it does not reflect a desire to replace it with a mere disparate-impact requirement.

45

It is clear from both the language of the new subsection (b) and the extensive Committee Report that accompanied the amendment that Congress intended to restore what it perceived to be the pre-Bolden status quo. Specifically, the subsection (b) language reflects vote-dilution rhetoric from pre-Bolden Supreme Court cases. Compare 42 U.S.C. § 1973(b) ("A violation . . . is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election . . . are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.") with, e.g., White v. Regester, 412 U.S. 755, 766, 93 S. Ct. 2332, 2339, 37 L. Ed. 2d 314 (1973) ("The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice."). The Committee Report specifically evinces the view of Congress that Bolden was contrary to its understanding of the operation of section 2, suggesting by strong implication at least that Congress had thought section 2 was operating successfully prior to Bolden. See, e.g., S. Rep. 97-417, at 15 (1982), reprinted in 1982 U.S.C.C.A.N. at 192 ("The proposed amendment to

46

Section 2 of the Voting Rights Act is designed to restore the legal standard that governed voting discrimination cases prior to the Supreme Court's decision in Bolden.").

Consistent with that intent, we have, as Judge Barkett suggests in her dissent, applied section 2 in the vote denial context. See Burton v. City of Belle Glade, 178 F.3d 1175, 1197-98 (11th Cir. 1999). Dismissing the vote-denial claim in a cursory manner in that case, however, we did not pause to establish the minimum requirements of a prima facie vote-denial claim under section 2, and the case is thus of dubious precedential value, least of all to support a proposition that mere disparate impact is sufficient to establish such a claim. In fact, if anything, our holding on the vote-denial claim in Burton stands for a contrary conclusion.[5] In short, nothing in Burton requires us to return this case to the district court simply because Florida's felon-disenfranchisement law disadvantages minorities out of proportion to their makeup of the general population of the State.

Thus, the pre-Bolden application of section 2, along with the legislative history surrounding the amendment and our own postamendment application of

---

[5] We can assume from the facts of Burton that the plaintiffs had alleged that the challenged policy in that case had in fact produced a disparate impact to the disadvantage of minority voters. By implication, that allegation was not in itself sufficient to sustain a vote-denial claim, as the court concluded that "Appellants have failed to raise a genuine issue of material fact as to whether they were denied the right to vote on account of race." Burton, 178 F.3d at 1198.

47

section 2 in the vote-denial context all point to the inexorable conclusion that something more than a mere showing of disparate effect is essential to a prima facie vote-denial case.[6] The reservoir of that requirement and the key to understanding the minimum content of such a case lie in the words "on account of" in subsection (a), for those words alone constrain the preceding, seemingly broad "applied in a manner which results in" language. Those words do not suggest, as the majority intimates, that Congress may have designed some lingering requirement of intent by state actors. See ante, at 29 n.30. Instead, as I have argued elsewhere, these words suggest a causation requirement, that is, a showing that racial bias in the relevant community caused the alleged vote denial or abridgment.[7] Zimmer set out some of the circumstantial factors that might be

---

[6] Additional support for this proposition can be found by implication in the final proviso of subsection (b): "Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b).

[7] See Nipper, 39 F.3d at 1515-24; id. at 1524 (opinion of Tjoflat, C.J., joined by Anderson, J.) ("[A] plaintiff must prove invidious discrimination in order to establish a violation of section 2 of the Voting Rights Act. Specifically, the plaintiff may prove either: (1) discriminatory intent on the part of [state actors] . . . ; or (2) objective factors that, under the totality of the circumstances, show the exclusion of the minority group from meaningful access to the political process due to the interaction of racial bias in the community with the challenged voting scheme."); Solomon v. Liberty County, 899 F.2d 1012, 1032 (11thCir. 1990) (en banc) (Tjoflat, C.J., specially concurring, joined by Fay, Edmondson, Cox, and Hill, JJ.) ("Prior to Bolden, in order to win a voting rights case, a plaintiff had to prove invidious discrimination. This could be done in one of two ways. . . . [T]he invidious discrimination requirement, as well as the two methods of proving it, remained part of section 2 [after amendment]."). Essentially, section 2 reflects an acknowledgment by Congress that even a facially neutral voting scheme can operate as a circuit for the oppression of minority voters by powerful private parties regardless of legislative intent. It maintains a requirement, however, that such an oppression be "on account

48

referred to in attempting to show such causation in the vote-dilution context, some of which are transferrable to the vote-denial context. I am mindful that voting rights are protected against "sophisticated as well as simple-minded modes of discrimination," Lane v. Wilson, 307 U.S. 268, 275, 59 S. Ct. 872, 876, 83 L. Ed. 1281 (1939), and that we should be alert to unconventional factors indicating bias-caused vote denials. But I do not believe there are any factors of causation, whether to be found in our precedent or in our wildest dreams, that can establish anything on the basis of the facts presented in this case other than that the causation of the denial of the right to vote to felons in Florida consists entirely of their conviction, not their race.

Nearly all of the evidence advanced by the plaintiffs demonstrates only disproportionality, but, as I have argued, it is a basic section 2 principle that something more must be shown to survive summary judgment. Plaintiffs argue in their brief that their proof "was significantly more extensive than simply 'evidence of disproportionate impact,'" but they rely chiefly on "different outcomes for

---

of race or color," and thus that an intent to produce a denial or abridgment of the right to vote on that basis must be present somewhere in the relevant community.

The Supreme Court recently gave similar meaning to the analogous phrase "on the basis of" when it held that Title IX authorizes an implied private right of action based on a claim of retaliation for whistle-blowing. See Jackson v. Birmingham Bd. of Educ., ___ U.S. ___, ___ S. Ct. ___, ___ L. Ed. 2d ___, No. 02-1672, slip op. at 4-5 (Mar. 29, 2005) (defining "retaliation" to be "'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination" (emphasis added)).

similarly situated offenders at various stages of the criminal justice process." The main thrust of their argument is that "racial bias in the criminal justice system" interacts with Florida's disenfranchisement provision to the disadvantage of minority voters. It is true that, if plaintiffs could support this claim with evidence, they might demonstrate the sort of causal connection between racial bias and disparate effect necessary to make out a vote-denial claim. But the evidence plaintiffs advance simply does not support this proposition, even if we were to reverse the district court's order excluding various experts from testifying. In fact, leaving aside the excluded evidence and raw disparate impact data, plaintiffs' brief does not appear to advance a single showing of contemporary race bias that ostensibly is producing the comparatively well-evidenced disparate-impact data.[8]

Thus, I do not believe that plaintiffs have made a case sufficient to survive summary judgment. I would avoid the task of determining whether a constitutional question is created by application of section 2 to felon-disenfranchisement provisions entirely and simply rule that plaintiffs do not have a case. In any event, even if the dissenters are correct that the majority has misanalyzed the statutory-

---

[8] Furthermore, notwithstanding the requirement that we view plaintiffs' evidence favorably in light of the procedural posture of this case, their burden is significant in light of the numerous filters and checks built into our criminal-justice system that are independently capable of weeding out cases improperly infused with racial motives. Those checks include grand juries, the right to a trial by a jury (and specifically by a jury whose composition has not been manipulated on the basis of race), an impartial judge supervising the trial, appellate and collateral state-court review, federal habeas review, and clemency.

50

interpretation question, the majority has arrived at the correct judgment in this case.  I thus concur.

WILSON, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority's holding that the defendants are entitled to summary judgment with respect to the plaintiffs' Equal Protection claim. Whatever discriminatory motives may have prompted Florida to enact the 1868 criminal disenfranchisement provision, the plaintiffs presented no evidence that intentional discrimination motivated the 1968 Constitutional Revision Committee. As a matter of law, the state met its burden by re-enacting the felon disenfranchisement provision without an impermissible motive, as suggested by *Hunter v. Underwood*, 471 U.S. 222, 228, 105 S. Ct. 1916, 1920 (1985). For the reasons stated by the majority, I concur in affirming the district court's resolution of this claim.

I write separately, however, to dissent from the majority's conclusion that racially discriminatory felon disenfranchisement provisions are not cognizable under § 2 of the Voting Rights Act ("VRA"). The majority overstates the case for constitutional avoidance. Because it is possible to harmonize the text of the VRA with the Constitution, we should not stray from the plain text of the statute. *See City of Rome v. United States*, 446 U.S. 156, 172, 100 S. Ct. 1548, 1559 (1980).

## I. SCOPE OF THE VOTING RIGHTS ACT

Section 2 of the VRA prohibits "voting qualification[s] . . . imposed or applied by any State" that "results in a denial or abridgement" of the right to vote "on account of race or color." 42 U.S.C. § 1973(a). As a comprehensive and

52

expansive remedy for racially discriminatory denials of the right to vote, § 2

reaches a wide variety of electoral practices and schemes.[1]  The standard for

evaluating a § 2 claim is "based on the totality of the circumstances."  42 U.S.C. §

1973(b).  As a purely textual matter, a voting qualification based on felony status

that interacts with social and historical conditions to produce a racially

discriminatory effect, such as race bias in the criminal justice system, falls within

the scope of the VRA.  *See Thornburg v. Gingles*, 478 U.S. 30, 45-47, 106 S. Ct.

2752, 2763-64 (1986) (describing interactive standard that accounts for "past and

present reality").

The majority fears that interpreting the VRA in this manner "raises serious

constitutional problems."  Consequently, the majority construes the statute to avoid

this "conflict," reading the VRA to preclude challenges to criminal

disenfranchisement provisions.

---

[1] *See, e.g., Morse v. Republican Party of Va.*, 517 U.S. 186, 116 S. Ct. 1186 (1996) (exclusion of protected groups from a nominating convention); *White v. Regester*, 412 U.S. 755, 93 S. Ct. 2332 (1973) (multi-member districts); *Arakaki v. Hawaii*, 314 F.3d 1091 (9th Cir. 2002) (restriction on race of candidate); *McMillan v. Escambia County*, 748 F.2d 1037 (11th Cir. 1984) (majority vote requirement in at-large election primary); *United States v. Marengo County Comm'n*, 731 F.2d 1546, 1574 (11th Cir. 1984) (at-large elections); *DeGrandy v. Wetherell*, 794 F.Supp. 1076 (N.D. Fla. 1992) (single-member districting plans); *Dillard v. Town of North Johns*, 717 F. Supp. 1471 (M.D. Ala. 1989) (selective withholding of candidacy requirement information and forms); *Harris v. Siegelman*, 695 F. Supp. 517 (M.D. Ala.1988) (refusal to appoint minority registration and election officials); *Irby v. Fitz-Hugh*, 693 F.Supp. 424 (E.D. Va. 1988) (shift from elective to appointive system); *Brown v. Dean*, 555 F. Supp. 502 (D.C.R.I. 1982) (location of polling place); *Arroyo v. Tucker*, 372 F. Supp. 764 (E.D. Pa. 1974) (English-only election system, where residents born in Puerto Rico do not speak, read, write, or comprehend English).

To reach its result, the majority places great stock in § 2 of the Fourteenth Amendment, which reduces a state's representation in Congress when the state denies its male citizens the right to vote unless it abridges the right "for participation in rebellion, or other crime." U.S. Const. amend. XIV, § 2. The majority characterizes this clause as *sui generis*–deeply rooted in our nation's history and fixed by the text of the Constitution. However, that Section does not constitute an affirmative grant of state power to disenfranchise criminals. Rather, as a Reconstruction Amendment, this Section was intended to punish states that were slow to grant the franchise by reducing their representation in Congress. In holding that states have unfettered discretion to disenfranchise criminals, the majority relies upon a clause that is an exception to this punishment.

Unlike the majority, I do not see a need to construe the statute in this manner. The "avoidance" canon of construction applies if there is ambiguous statutory language. *See Southlake Prop. Assoc., Ltd. v. City of Morrow*, 112 F.3d 1114, 1119 (11th Cir. 1997). Where, as here, there is no ambiguity, the "avoidance" doctrine should not be employed as a pretext for rewriting clear statutory language. *Harris v. Garner*, 216 F.3d 970, 984-85 (11th Cir. 2000) (citation omitted).

Furthermore, I do not think that § 2 of the Fourteenth Amendment amounts to a right to disenfranchise citizens at will, heedless of the consequences. It is a

right only by implication, and therefore does not conflict with Congress's power to limit criminal disenfranchisement. The Fourteenth Amendment does not define the outer limits of a state's "right" to disenfranchise criminals, but it is certain that a state's right to disenfranchise is not absolute. States may not *intentionally* disenfranchise felons on account of race. *Hunter*, 471 U.S. at 233, 105 S. Ct. at 1922. Likewise, I believe that a state may not disenfranchise criminals in a manner resulting in a racially discriminatory denial of the right to vote. This is because the VRA reaches conduct for which it may not always be possible to prove purposeful discrimination. The VRA recognizes that discriminatory effects are probative of race bias in electoral schemes and practices.

In sum, § 2 of the Fourteenth Amendment does not conflict with Congress's attempts to prohibit criminal disenfranchisement that is not racially neutral. That clause does not limit Congress's power to prohibit a voting qualification that results in a denial of equal access to the electoral process on the basis of race or color. *See* 42 U.S.C. § 1973. I see no conflict between the Constitution and the VRA in this regard, and therefore I see no reason to interpolate an exemption that does not exist.

I do not quarrel with the state's discretion to disenfranchise felons as a matter of policy. Rather, I take issue with the majority's characterization of that discretion. Far from "deny[ing] Florida the discretion to disenfranchise felons," as

55

the majority fears, states are free "to disenfranchise convicted felons in a racially neutral manner–that is, in a manner that is neither racially motivated nor produces racially disproportionate effects." *Johnson v. Bush*, 353 F.3d 1287, 1306 n.27 (11th Cir. 2003). My view is that the Voting Rights Act prohibits criminal disenfranchisement provisions that accomplish denial of the right to vote "on account of race." 42 U.S.C. § 1973(a).

Importantly, I am not convinced that the plaintiffs have proven their case. The plaintiffs' statistical evidence raises an inference that the disparate impact of felon disenfranchisement results from the interaction of that scheme with race bias in the criminal justice system and the lingering effects of racial exclusion.[2] In a

---

[2] Judge Tjoflat argues in his concurrence that a plaintiff's showing of disproportionate effect does not suffice to make out a *prima facie* case of a § 2 VRA claim. It is far from clear that the language of § 2 VRA claim reinstates the law of the pre-*Bolden* cases. Congress could have specified in § 2 that some of the *White* factors were strongly probative of intent, and that proof of "something more than effect" was the *sine qua non* of a § 2 claim, regardless of whether the proof was direct or indirect. *See White v. Regester*, 412 U.S. 755, 93 S. Ct. 2332 (1973). Given Congress's express language, however, it is plausible that the amended § 2 was meant to ensure racial minorities equal access to the vote, regardless of intent. *See, e.g.*, *City of Mobile v. Bolden*, 446 U.S. 55, 103–41, 100 S. Ct. 1490, 1519–39 (1980) (Marshall, J., dissenting).

Indeed, it is far from clear that the state of pre-*Bolden* law did not recognize vote dilution claims based solely on effect. *See Burns v. Richardson*, 384 U.S. 73, 88, 86 S. Ct. 1286, 1294 (1966), (stating that the standard for vote dilution claim is "invidious effect"); *Fortson v. Dorsey*, 379 U.S. 433, 439, 85 S. Ct. 498, 501 (1965) ("It might well be that, designedly *or otherwise*, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would *operate* to minimize or cancel out the voting strength of racial or political elements of the voting population." (emphasis added)).

In the event that Judge Tjoflat's interpretation is the correct one (that proof of "something more" is required), I do not think that interpretation leads inexorably to the conclusion that a plaintiff's showing of disproportionate effect does not satisfy the summary judgment burden. On the contrary, one of the permissible inferences that can, and must, be drawn from the plaintiffs' showing here is that the disproportionate effect was caused by race.

56

trial on the merits, the defendants would be given every opportunity to present rebuttal evidence to question the methodology of this analysis or to present their own analysis explaining the disparity. I dissent because I believe that the district court's resolution of the merits was premature and that the plaintiffs were entitled to present their case at trial.

## II. SCOPE OF CONGRESS'S POWER

The majority also suggests that, were a § 2 VRA claim challenging criminal disenfranchisement provisions cognizable, Congress might have exceeded its enforcement powers of the Fourteenth and Fifteenth Amendments. I respectfully disagree with this conclusion.

Congress's enforcement authority is at its most expansive when protecting against discrimination based on suspect classifications or when protecting fundamental rights. Thus, to carry out the basic objectives of the Fourteenth and Fifteenth Amendments, Congress may enact "prophylactic legislation proscribing practices that are discriminatory in effect, if not in intent." *Tennessee v. Lane*, 541 U.S. 509, __, 124 S. Ct. 1978, 1986 (2004) (upholding Title II of the Americans with Disabilities Act as a valid exercise of Congress's Fourteenth Amendment enforcement power); *see also City of Rome*, 446 U.S. 156, 100 S. Ct. 1548

---

Thus, I believe that the plaintiffs have carried their summary judgment burden by producing evidence of a disproportionate effect.

(upholding VRA's § 5 preclearance requirement for covered jurisdictions seeking electoral changes as a valid exercise of Congress's Fifteenth Amendment enforcement power).

Despite the strength of Congress's remedial enforcement power, it is not without limits. Congress's remedy must respond to states' actual violations of a protected right. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 89, 120 S. Ct. 631, 649 (2000)*; Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 640, 199 S. Ct. 2199, 2207 (1999). Therefore, Congress must identify the "history and pattern of unconstitutional . . . discrimination" that it seeks to address, creating a legislative record to support its exercise of enforcement power. *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 368, 121 S. Ct. 955 (2001). Furthermore, valid § 5 legislation must exhibit "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne v. Flores*, 521 U.S. 507, 520, 117 S. Ct. 2157, 2164 (1997).[3]

Congress enacted the VRA pursuant to the enforcement clauses of the Fourteenth and Fifteenth Amendments in response to rampant violations of the

---

[3]It bears noting that the Supreme Court has yet to determine whether the "congruence and proportionality" test applies to the Fifteenth Amendment. I assume here that it would. Because the VRA is a congruent and proportional remedy, and therefore well within Congress's enforcement power under the Fourteenth Amendment, an inquiry into the Fifteenth Amendment's scope is not required.

right to vote. *United States v. Bd. of Comm'rs*, 435 U.S. 110, 126-27, 98 S. Ct. 965, 976-77 (1978). The scope of the VRA and those amendments are not coterminous: As a remedial statute, the VRA reaches beyond what is prohibited by the Fourteenth and Fifteenth Amendments. *See, e.g., United States v. Marengo County Comm'n*, 731 F.2d 1546 (11th Cir. 1984). The VRA not only safeguards a fundamental right, voting, but also protects against discrimination based on race, a suspect class. *See Lane*, 541 U.S. at __, 214 S. Ct. at 1992 (noting that because fundamental rights, such as access to the courts, receive heightened scrutiny, review of the legislative record for a pattern of constitutional violations is less searching); *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 735-36, 123 S. Ct. 1972, 1981-82 (2003) (explaining that for suspect classifications, such as sex, that are subject to heightened scrutiny, it is "easier for Congress to show a pattern of state constitutional violations"). The Act is properly considered a remedial statute, passed with the broadest exercise of power allowed under the Fourteenth and Fifteenth Amendments.

The VRA is entitled to a broad reading because Congress has chronicled extensive state violations of the right to vote. In 1965, when first enacting the VRA, Congress documented violations of the Fifteenth Amendment, including "grandfather clauses" that permitted previously registered voters (all white) to register without taking a literacy test, laws restricting the participation in political

primaries to whites only, procedural hurdles, racial gerrymandering, improper challenges, and the discriminatory use of tests. *See* H.R. Rep. No. 89-439, at 8 (1965) (citing Supreme Court decisions). Congress was particularly concerned about states' use of tests that discriminated against racial minorities, including literacy tests, constitutional interpretation tests, and tests concerning the obligations of citizenship. H.R. Rep. No. 89-439, at 12.

All of these devices worked in concert to depress the registration and turnout rate among voting-age African Americans. For example, prior to the VRA only 6.7 % of the African-American voting age population in Mississippi was registered to vote. In Alabama, the registration rate of African Americans lagged behind that of whites by 49.9 %. *See* S. Rep. No. 94-295, at 13 (1975), *reprinted in* 1975 U.S.C.C.A.N. 774, 779. Perhaps more problematic was the revelation that innovation in discrimination marked the landscape of voting rights. *See* S. Rep. No. 89-162, at 5 (1965); S. Rep. No. 89-439, at 10 ("[E]ven after apparent defeat resisters seek new ways and means of discriminating. Barring one contrivance too often has caused no change in result, only in methods.") (citing *United States v. Mississippi*, 380 U.S. 128 (1965), and *United States v. Penton*, 212 F. Supp. 193 (M.D. Ala.) (1962)). Congress found specifically that it was impossible to predict the variety of means that would be used to infringe on the right to vote.

In response, Congress passed the VRA, which operates on two levels. First,

60

Congress recognized that some areas of the country had a particularly bad history of voting discrimination. Section 5 of the VRA thus designated these regions as "covered jurisdictions, " requiring them to clear any changes in voting or election laws with either the Attorney General or a federal court in the District of Columbia before putting them into effect. 42 U.S.C. § 1973c. The approval of the Attorney General or the court was conditioned on a showing that the changes would not discriminate in purpose or in effect. Additionally, because Congress understood that violations of voting rights were not confined to covered jurisdictions, it included § 2, a nationwide remedy less intrusive on states' functions. *See* S. Rep. No. 97-417, at 41-42 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 219-20.

It is of no moment that the VRA's legislative record does not contain specific examples of discrimination based on felon status. *Boerne* and its progeny require that the legislative record show a pattern of state constitutional violations, not that the right at issue be abridged in a particular way. *See Lane*, 541 U.S. at __, 124 S. Ct. at 1988-90; *Garrett*, 531 U.S. at 368-69, 121 S. Ct. at 964-65; *Kimel*, 528 U.S. at 89, 120 S. Ct. at 648-49; *Boerne*, 521 U.S. at 530, 117 S. Ct. at 2169. If this were the standard, states would always have one free bite at the apple, which is not what Congress intended when it passed the VRA to deal with voting discrimination "comprehensively and finally." S. Rep. No. 97-417, at 5, *reprinted in* 1982 U.S.C.C.A.N. at 182.

61

Congress has found that racial discrimination in voting has a long history in our country. The remedy that Congress chose to respond to the pattern of state discrimination is to prohibit voting discrimination in whatever form it takes. *See Gingles*, 478 U.S. at 45 n.10, 106 S. Ct. at 2764 n.10 ("Section 2 prohibits all forms of voting discrimination . . . ."). This remedy is congruent and proportional to the goal of enforcing the fundamental right to vote. When voting interacts with proof of racial bias in criminal justice, Congress is well within its power to prohibit the resultant discrimination.

BARKETT, Circuit Judge, dissenting:

I dissent because I believe summary judgment was improperly granted on both plaintiffs' claims under the Equal Protection Clause of the Constitution and Section 2 of the Voting Rights Act.

## I. The Equal Protection Claim

The majority frames the question presented in this case as "whether the plaintiffs have alleged facts that, if true, would be sufficient to establish *intentional* discrimination in Florida's *current* disenfranchisement law." Majority Op. at 6 (emphasis in original). The framing of the question in this way dictates an answer that, in my view, fails to correctly analyze the equal protection claim here in the context of a summary judgment motion.

The majority and the district court simply find that because there is no evidence of intentional discrimination in the 1968 re-enactment of the relevant constitutional provision, the defendants are entitled to summary judgment. But given the nature of the plaintiffs' claim and the evidence they present, the court cannot look at the 1968 re-enactment in a vacuum. The plaintiffs contend that the original constitutional provision of 1868 (taking the evidence in the light most favorable to the plaintiffs at this stage) was passed for racially discriminatory

purposes.[1]  If that is so, then <u>United States v. Fordice</u>, 505 U.S. 717, 739 (1992),

and <u>Knight v. Alabama</u>, 14 F.3d 1534, 1550 (11th Cir. 1994) teach us that to

repudiate the tainted earlier provision, the government must show not only a lack

of intentional racial discrimination in the 1968 re-enactment, but also that the re-

enactment was motivated by independent, legitimate goals that "broke the chain"

linking it to the original discriminatory motive.  This would not require the state to

explicitly address the law's odious origins, but simply articulate the non-racial

policy justification that drove its re-enactment.

Where the state has not demonstrated any race-neutral basis for the re-

enactment, there can be no "break" in the chain of invidious intent.  <u>See, e.g.</u>,

<u>Fordice</u>, 505 U.S. at 739; <u>Knight</u>, 14 F.3d at 1550 (holding that, "[o]nce it is

determined that a particular policy was originally adopted for discriminatory

reasons, [and] . . . is 'traceable' to the original tainted policy, or is 'rooted' or has

its 'antecedents' in that original policy" the burden of proof lies with the state to

---

[1]The district court found that the "[p]laintiffs have presented to this Court an abundance of expert testimony about the historical background of Florida's felon disenfranchisement scheme as historical evidence that the policy was enacted . . . with the particular discriminatory purpose of keeping blacks from voting."  214 F.Supp.2d 1333, 1338-39 (S.D. Fla. 2002).  While ultimately assuming, for the sake of summary judgment, that racial animus motivated Florida's 1868 disenfranchisement law, the majority goes to great lengths to question the sufficiency of plaintiffs' evidence and to offer alternative explanations for each historical fact that suggests a discriminatory motive.  I believe that in doing so the majority erroneously views the facts and draws all reasonable inferences, not in favor of the non-moving party, but rather in favor of the state.  <u>See</u> <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995).

show that it has dismantled the past discrimination to "break the causal chain").

Though the majority cautions that we have never followed the rule of Fordice outside of the educational context,[2] I believe there is no principled basis not to apply Fordice to a matter of equal if not greater importance – the fundamental right to participate in the democratic process.  Cf. Reynolds v. Sims, 377 U.S. 533, 561-62 (1964) ("the right of suffrage is a fundamental matter . . . . preservative of other basic civil and political rights").

In addition to its concerns regarding the application of Fordice outside of the educational context, the majority holds that the rule announced in Fordice is inapplicable here because there are valid public policy reasons for disenfranchising felons, while no such reasons underpinned the educational policies considered in Fordice.  Though the valid reasons recognized by the court may have driven Florida's decision to retain its felon disenfranchisement scheme, the record fails to demonstrate that those reasons in fact motivated the 1968 re-enactment.  The court's attempt to distinguish Fordice based on the existence of a potentially valid public policy thus begs the very question of the motivation behind the 1968 re-

---

[2]While the majority cites to Burton v. City of Belle Glade, 178 F.3d 1175, 1190 (11th Cir. 1999) (finding that "[a]ppellants can point to no court that has ever applied Fordice outside of the education setting"), this circuit has suggested that Fordice applies in the employment setting, preventing public employers from escaping their constitutional obligations simply by enacting race-neutral policies that institutionalize the effects of prior discrimination.  See Ensley Branch, NAACP v. Seibels, 31 F.3d 1548, 1575 (11th Cir. 1994).

65

enactment. Though valid public policies might have similarly underpinned the educational policies at issue in Fordice, the Court nonetheless required the state to demonstrate that those policies had a sound race-neutral educational justification.

Although the majority does not recognize the Fordice framework as applicable in this context, it nonetheless suggests that the record here supports a conclusion that the 1968 re-enactment was driven by race-neutral considerations because it was "deliberative." Majority Op. at 18-19. There is no indication, however, in the record of deliberations that the subcommittee had any non-discriminatory reasons for re-enacting the disenfranchisement law, nor any indication that the Constitutional Revision Committee as a whole or the legislature even discussed it. While the 1968 subcommittee minutes trace the committee's procedure and its changes to the disenfranchisement provision's text, their limited nature sheds no light at all as to whether the committee was motivated by legitimate non-discriminatory reasons, or whether they saw the felon disenfranchisement provision as a legacy of previous constitutions whose justification did not need to be revisited in substance. Cf. Richardson v. Ramirez, 418 U.S. 24, 44 (1974) ("[T]he Journal of that Committee's proceedings shows only what motions were made and how the various members of the Committee voted on the motions; it does not indicate the nature or content of any of the discussion in the Committee. While the Journal thus enables us to trace the

66

evolution of the draft language in the Committee, it throws only indirect light on the intention or purpose of those who drafted § 2"). As such, while the adjective "deliberative" describes the procedural aspects of the decision, it need not include any substantive component at all.

The record at this juncture does not permit a conclusion that the legislature's textual modifications removed the prior racial taint in any meaningful way. Where the provision explicitly disenfranchising all felons remained unchanged in substance, and without evidence that the 1968 re-enactment had an independent, legitimate motivation, the majority's conclusion that the 1968 process cleansed the taint of racial aminus as a matter of law is unfounded at this stage of the proceedings. See Fordice, 505 U.S. at 747 (Thomas, J., concurring) (observing that "discriminatory intent does tend to persist through time"); Kirkey v. Bd. of Supervisors, 554 F.2d 139, 148 (5th Cir. 1977) (en banc) ("[N]othing in [Washington v. Davis or Arlington Heights] suggests that, where purposeful and intentional discrimination already exists, it can be constitutionally perpetuated into the future by neutral official action."). Indeed, under the majority's rule, legislatures could continue to utilize statutes that were originally motivated by racial animus, and that continue to produce discriminatory effects, so long as they re-promulgate the statutes "deliberately" and without explicit evidence of an illicit motivation.

67

To conclude that the 1968 re-passage of Florida's felon disenfranchisement provision is in and of itself sufficient to "eliminate the racial taint," the majority relies on the Fifth Circuit's decision in Cotton v. Fordice, 157 F.3d 388 (5th Cir. 1998). The panel in Cotton, like the majority, fails to analyze the claim presented in terms of the government's burden to show that a legitimate neutral reason underlaid its re-enactment of a law tainted by racial animus. However, even if I were to accept the Fifth Circuit's rule in Cotton, the case is distinguishable on its facts. The statute in Cotton, Mississippi's felon disenfranchisement law, was originally crafted to intentionally deny the vote to those convicted of so-called "black crimes," while preserving the franchise for those felons convicted of crimes thought to be committed by whites. Cotton holds that the legislature successfully removed the original "taint" of this discriminatory scheme by removing "black crimes" from the disenfranchising list, and successively adding murder and rape – "crimes historically excluded . . . because they were not considered 'black' crimes." Cotton, 157 F.3d at 391. Thus, the legislative amendment process in Cotton proceeded as the converse of the enactment process: the amendment removed those aspects of the law shown to be rooted in racial animus. The same cannot be said for Florida's felon disenfranchisement law. Its 1968 re-enactment

68

resulted in only non-substantive textual changes to the statute,[3] leaving unchanged

the essential feature that plaintiffs' evidence links to racial animus: Florida's

disenfranchisement of all felons.

As the district court found and the majority assumes, plaintiffs' showing of

racial animus in the original 1868 enactment raises a genuine issue of material fact

as to whether it was adopted with a discriminatory purpose. Where the record is

insufficient to conclude that either the 1968 re-enactment was motivated by

legitimate concerns or that the 1868 provision would have been enacted even

without racial motivations, summary judgment was improperly granted.

## II. The Voting Rights Act Claim

The simple question before us is whether or not Section 2 of the Voting

Rights Act ("VRA") is applicable to plaintiffs' claim that they have been <u>denied</u>

---

[3]The 1868 provision, as amended in 1885, provided that "No person under guardianship, *non compos mentis* or insane shall be qualified to vote at any election, nor shall any person convicted of felony by a court of record be qualified to vote at any election unless restored to civil rights." Fla. Const. art. VI, § 4 (1885). Following the 1968 re-enactment process the text read, "No person convicted of a felony, or adjudicated in this or any other state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability." Fla. Const. art. VI, § 4 (1968). The 1968 changes also eliminated a provision which empowered the legislature to disenfranchise those convicted of certain misdemeanors. Fla. Const. art. VI, § 5 (1885). While the majority emphasizes this revision, the plaintiffs' evidence of racial intent does not hinge on or relate to the eliminated provision. Unlike the plaintiffs in <u>Cotton</u>, whose claim arose from the disenfranchisement of those committing certain "black crimes", plaintiffs' claim of racial bias relates to Florida's disenfranchisement of all felons.

the right to vote.  As the majority states, this is not a vote dilution claim.[4]

Although I do not know whether plaintiffs can ultimately succeed, their contention

that Florida's felon disenfranchisement law effectively denies their right to vote

because they are black is clearly encompassed by the plain language of the VRA,

which prohibits state enforcement of any "qualification or prerequisite to voting"

that "results in a denial or abridgement of the right of any citizen of the United

States to vote on account of race or color . . . ."  42 U.S.C. § 1973(a) (2005);

Farrakhan v. Washington, 338 F.3d 1009, 1016 (9th Cir. 2003), cert. denied sub

nom. Locke v. Farrakhan, 125 S.Ct. 477 (2004); Baker v. Pataki, 85 F.3d 919, 935-

36 (Feinberg, J., writing for an equally divided court) (2d. Cir. 1996)[5]; Wesley v.

Collins, 791 F.2d 1255, 1259 (6th Cir. 1986) (considering, without analysis, a

felon disenfranchisement claim brought under Section 2 of the VRA); see also,

---

[4]While much of the case law interpreting Section 2 of the VRA focuses on the dilution of minority voting strength, see e.g., Holder v. Hall, 512 U.S. 874 (1994); Thornburg v. Gingles, 478 U.S. 30 (1986); Nipper v. Smith, 39 F.3d 1494 (11th Cir. 1994) (en banc), we have recognized that the statute's results test, as determined under the totality of the circumstances, applies by its terms to absolute denials of the vote.  See City of Belle Glade v. Burton, 178 F.3d 1175, 1196 (11th Cir. 1999) ("[T]wo distinct types of discriminatory practices and procedures are covered under Section 2: those that result in 'vote denial' and those that result in 'vote dilution.'").

[5]In Baker, an en banc panel of the Second Circuit considered whether Section 2 of the VRA applied to New York's felon disenfranchisement law.  Because the panel divided equally, 5 to 5, the lower court opinion denying VRA coverage was affirmed.  While the majority relies heavily on Muntaqim v. Coombe, 366 F.3d 102 (2d. Cir. 2004), we note that the Second Circuit has granted en banc review of Muntaqim and has yet to issue its decision. See Muntaqim, 396 F.3d 95 (2d. Cir. 2004).

Thornburg v. Gingles, 478 U.S. 30, 45 n.10 (1986) ("Section 2 [of the VRA] prohibits all forms of voting discrimination . . . .").

The first step in statutory interpretation requires that courts apply the plain meaning of the statutory language unless it is ambiguous. Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992); United States v. Fisher, 289 F.3d 1329, 1337-38 (11th Cir. 2002). Only when we find ambiguity in the statute's text do we apply canons of statutory interpretation, such as the canon of constitutional avoidance that the majority utilizes. Dep't of Hous. & Urban Dev. v. Rucker, 535 U.S. 125, 134 (2002). The language of Section 2 of the VRA is unambiguous, and compels a conclusion that it applies to felon disenfranchisement provisions. Such a provision is unquestionably a "voting qualification or prerequsite to voting"[6] that is "applied by [the] state." 42 U.S.C. § 1973(a) (2005). Whether or not felon disenfranchisement results in vote denial "on account of race or color" under the totality of the circumstances remains the ultimate question for the trier of fact.

Given the plain meaning of the language of Section 2, we are thus squarely faced with the issue of whether its application to felon disenfranchisement schemes is constitutional. I find no constitutional infirmity in applying Section 2 to felon

---

[6]See Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45, 51 (1959) ("Residence Requirements, age, previous criminal record (Davis v. Beason, 133 U.S. 333, 345-347 [1890]) are obvious examples indicating factors which a State may take into consideration in determining the *qualification of voters*.") (emphasis added).

71

disenfranchisement statutes, and find unpersuasive the majority's argument that it impermissibly conflicts with Section 2 of the Fourteenth Amendment and raises questions about Congress' civil rights enforcement powers.

First, there is no conflict between the Constitution and the VRA. The majority's finding of a conflict between the VRA and Section 2 of the Fourteenth Amendment stems from its failure to distinguish between felon disenfranchisement laws generally and those that result in racial discrimination. Section 2 of the Fourteenth Amendment merely permits states to disenfranchise felons without suffering a reduction in congressional representation. Nothing in Section 2 of the Fourteenth Amendment grants states unfettered discretion to disenfranchise felons, much less permits felon disenfranchisement on the basis of race. Hunter v. Richardson, 471 U.S. 222, 233 (1985) ("[Section] 2 was not designed to permit the purposeful racial discrimination [in Alabama's criminal disenfranchisement law] . . . which otherwise violates [Section] 1 of the Fourteenth Amendment. Nothing in . . . Richardson v. Ramirez suggests the contrary."). Nor does Section 2 preclude Congress from legislatively addressing criminal disenfranchisement laws that have the effect of disenfranchising felons because of their race pursuant to its civil rights enforcement powers. Baker, 85 F.3d at 936-37 (Feinberg, J., writing for an equally divided court) (citing City of Rome v. United States, 446 U.S. 156, 177 (1980) (explaining that Congress can use its enforcement powers to prohibit conduct that

72

does not itself violate the Civil War Amendments, so long as the prohibitions on racial discrimination in voting are appropriate)).  The VRA does not undermine a state's "delegated power" to disenfranchise felons, as the majority suggests. Applying the VRA's plain text would not automatically draw into question state disenfranchisement statutes in general.  Rather, it would only constrain states from enacting felon disenfranchisement regimes that result in the "denial . . . of the right . . . to vote on account of race or color."  42 U.S.C. § 1973(a) (2005) (emphasis added).  There is thus no conflict between the limited parameters that the VRA's Section 2 places on state disenfranchisement laws and the apportionment provisions found in Section 2 of the Fourteenth Amendment.

Second, the majority purports to exclude felon disenfranchisement from coverage under the VRA because of its concern over the lack of a congressional record chronicling constitutional violations stemming from state felon disenfranchisement laws.  While the factual evidence of discrimination that Congress considered in enacting Section 2 did not include evidence of racially motivated felon disenfranchisement, there is no requirement that Congress make factual findings as to every potential application of a civil rights statute passed pursuant to its powers to enforce the Fourteenth and Fifteenth Amendments.[7]  This

---

[7]Nor is Congress required to impose temporal or geographic restrictions (whose absence from Section 2 the majority finds so troubling) on statutes passed pursuant to its civil rights

73

is particularly so where Congress could not even have begun to identify every potential discriminatory voting qualification that would be subject to the VRA, given the "increasing sophistication with which the states were denying racial minorities the right to vote." Farrakhan, 338 F.3d at 1014; see also S. Rep. No. 89-439, at 10 (1965) ("[E]ven after apparent defeat, resisters seek new ways and means of discriminating. Barring one contrivance too often has caused no change in result, only in methods.").

Insofar as the majority discerns congressional intent to exclude felon disenfranchisement from coverage under Section 2 of the VRA in subsequent congressional enactments that make provisions for felon disenfranchisement, it again overlooks the distinction between felon disenfranchisement laws generally and the narrow subset of such laws that result in racial discrimination. The simple fact that Congress made provisions for felon disenfranchisement in post-VRA statutes says nothing of whether Congress intended to insulate racially discriminatory disenfranchisement schemes from attack under the VRA. Furthermore, where the majority relies on the legislative history of the "test or devices" standard found in Section 4 of the VRA to locate legislative intent as to

---

enforcement authority. See, e.g., Oregon v. Mitchell, 400 U.S. 112, 118 (1970) (upholding a nationwide ban on use of literacy tests without any expiration date or geographical limit, and without congressional fact-finding on the discriminatory use of literacy tests in every state).

74

the application of Section 2 to felon disenfranchisement, its approach overlooks the fact that because the VRA "contains a number of different provisions each with a different objective . . . the reader cannot, therefore, assume that each of the sections is designed to reach the same objective or is necessarily to be read in the same manner."[8] United States v. Uvalde Consol. Indep. Sch. Dist., 625 F.2d 547, 550 (5th Cir. 1980); see also Baker, 85 F.3d at 939 (Feinberg, J., writing for an equally divided court) ("[B]ecause [Sections] 2 and 4 have different purposes, scope and language, the legislative history of [Section] 4(c) is not necessarily applicable to the interpretation of [Section] 2.").

Irrespective of states' authority to disenfranchise felons,[9] or the frequency with which states have historically exercised that authority, the Supreme Court has made clear that states cannot use felon disenfranchisement to intentionally discriminate on the basis of race. Hunter, 471 U.S. at 233. In view of Hunter, there can be no reason why Congress cannot act to prevent such discrimination, using its civil rights enforcement powers to reach felon disenfranchisement laws

---

[8]The majority's citation to United States v. Ward, 352 F.2d 329, 332 (5th Cir. 1965) suffers from the same infirmity. Ward simply notes that disqualification for a felony conviction would not qualify as a "test or device" prohibited in those jurisdictions subject to Section 4(c) of the VRA. Nothing in Ward construes or relates to Section 2 of the VRA, much less its coverage of felon disenfranchisement laws.

[9]Of course, I recognize that non-discriminatory felon disenfranchisement statutes, standing alone, raise no equal protection violation. See Ramirez, 418 U.S. at 54-55.

75

with racially discriminatory results, as it did in Section 2.  See Baker, 85 F.3d at 938 (Feinberg, J., writing for an equally divided court); see also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 499 (1985) ("[T]he fact that [a statute] has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth.").

The majority's focus on the absence of congressional findings as to felon disenfranchisement, and its disregard of the statutory text, eviscerates Congress's intent to give Section 2 the "broadest possible scope."  Allen v. State Bd. of Elections, 393 U.S. 544, 566-67 (1969).  More importantly, the majority's approach renders statutes passed pursuant to Congress' civil rights enforcement powers little more than stale documents, applicable only to those forms and patterns of discrimination evident at the time of passage and explicitly considered by Congress, irrespective of the breadth of the plain statutory text.

Nor does the "plain statement" rule of Gregory v. Ashcroft, 501 U.S. 452 (1991), which counsels the majority's avoidance approach, prevent plaintiffs from proceeding under the VRA.  The canon of construction at issue in Gregory holds that where Congress intends to alter the "usual constitutional balance between the states and federal government," it must make its intent to do so unmistakably clear in the statute.  Id. at 460-61 (internal citation marks omitted).  As Judge Feinberg concluded in his persuasive opinion, however, the Fourteenth and Fifteenth

76

Amendments altered the constitutional balance between the two sovereigns – <u>not</u> the Voting Rights Act, which merely enforces the guarantees of those amendments. <u>Baker</u>, 85 F.3d at 938 (Feinberg, J., writing for an equally divided court) (citing <u>City of Rome</u>, 446 U.S. at 179 (holding that the Civil War Amendments "were specifically designed as an expansion of federal power and an intrusion on state sovereignty")); <u>see also</u> <u>id.</u> at 942 (Newman, J., concurring).

Moreover, the Supreme Court has explicitly held that the <u>Gregory</u> "plain statement" canon is wholly inapplicable where the statutory language unambiguously applies to a particular state function. <u>Pa. Dep't of Corr. v. Yeskey</u>, 524 U.S. 206, 209 (1998). In <u>Yeskey</u>, the petitioners contended that under <u>Gregory</u>, state prisons were not subject to the Americans with Disabilities Act based on the lack of a "plain statement" indicating congressional intent to alter the constitutional balance by regulating state prisons. <u>Id.</u> at 208-09. The Court limited <u>Gregory</u>'s plain statement rule, holding it inapplicable because the prison fell squarely within statutory language providing for coverage of "public entities." <u>Id.</u> at 209-10. Similarly, Congress need not have included a "plain statement" on the VRA's application to criminal disenfranchisement statutes, as those statutes fall squarely within the VRA's textual prohibition on any "qualification or prerequisite to voting . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a) (2005).

77

The only "ambiguity" the majority finds in the VRA is its "conflict" with the Fourteenth Amendment's apportionment clause. Not only does Section 2's prohibition on racially discriminatory felon disenfranchisement schemes fail to conflict with the Fourteenth Amendment, as discussed above, but such a perceived conflict is easily distinguishable from the case of ambiguity within a statute's text, which animated Gregory. See Gregory, 501 U.S. at 469-70; see also Salinas v. United States, 522 U.S. 52, 60 (1997) ("The plain statement requirement articulated in Gregory . . . does not warrant a departure from the statute's terms. The text . . . is unambiguous.").

While the majority would use this "ambiguity" to avoid the result dictated by the VRA's plain meaning and dispose of plaintiffs' claim, I would remand for determination by the trier of fact whether, under the totality of the circumstances[10],

---

[10]Although the district court failed to examine the plaintiffs' evidence under the totality of the evidence standard that governs Section 2 claims, Judge Tjoflat's concurrence argues that a remand is unnecessary as "plaintiffs have been unable to show that whatever denial or abridgment of voting rights resulted from Florida's felon disenfranchisement provision occurred 'on account of race or color.'" First, because plaintiffs are appealing the district court's grant of summary judgment, it is not necessary that they show at this stage that their votes were denied on account of race. Rather, they need only show that genuine issues of material fact remain. That, they have certainly done. As I explained in the panel opinion, as the district court wrongly excluded evidence on several of the "senate factors", plaintiffs can point to evidence on racially polarized voting, prejudice in the criminal justice system, socio-economic disparities, and a history of official discrimination. Johnson, 353 F.3d at 1305-06 and n.25. This evidence goes beyond disparate impact, and when considered in the light most favorable to plaintiffs, permits a conclusion that felon status "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Gingles, 478 U.S. at 47. Moreover, to the extent that Judge Tjoflat's construction of the "totality of the circumstances" inquiry imposes a requirement that plaintiffs demonstrate discriminatory

78

plaintiffs' votes were denied "on account of race" in violation of the VRA.

---

intent "from somewhere in the relevant community", such a requirement appears nowhere in the pre-<u>Bolden</u> iterations of the senate factors and is inconsistent with the Congressional objective of eliminating intent from Section 2.  See <u>Thornburg v. Gingles</u>, 478 U.S. 30, 35 (1986) ("[Following <u>Bolden</u>], Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test,' applied by this Court in <u>White v. Register</u>, 412 U.S. 755 (1973), and by other federal courts before <u>Bolden</u>."); <u>Chishom v. Roemer</u>, 501 U.S. 380, 394 (1991) ("Under the amended statute, proof of intent is no longer required to prove a § 2 violation. Now plaintiffs can prevail under § 2 by demonstrating that a challenged election practice has resulted in the denial or abridgment of the right to vote based on color or race. Congress not only incorporated the results test in the paragraph that formerly constituted the entire § 2, but also designated that paragraph as subsection (a) and added a new subsection (b) to make clear that an application of the results test requires an inquiry into 'the totality of the circumstances.'").